# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-1641

EVGUENIA GONTCHAROVA and KSENIA KIDANOVA,

*Petitioners,*

*v.*

JOHN D. ASHCROFT,

*Respondent.*

On Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A77 856 642 & A77 856 643

ARGUED MAY 19, 2004—DECIDED SEPTEMBER 29, 2004

Before CUDAHY, RIPPLE, and WILLIAMS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* The question in this asylum case is whether the immigration judge properly applied the "corroboration rule," under which an asylum applicant may be required to present evidence corroborating her testimony even when that testimony is deemed credible. The test, as set forth by the Board of Immigration Appeals, hinges on whether it is "reasonable to expect" the applicant to produce particular pieces of evidence. Because we conclude that the rule was unreasonably applied in this case, we grant the petition for review.

The petitioners, Evguenia Gontcharova and her daughter Ksenia Kidanova, are from Kaliningrad, the westernmost

province of Russia. They arrived in the United States in August 1998 as visitors. A year later, they applied for asylum and withholding of deportation, claiming that they were persecuted in Kaliningrad because of the whistleblowing activities of Evguenia's husband, Andrei Kidanov.

According to the narrative accompanying Evguenia's and Ksenia's asylum application, their family was targeted for persecution after Andrei, a tax inspector, discovered evidence of widespread corruption involving the appropriation of public resources by a firm with close ties to the province's governor. In the face of his agency's unwillingness to pursue an investigation, Andrei made copies of the incriminating documents and hid them at the home of his sister, Lena. Andrei's repeated efforts to draw attention to the corruption led to threats against him and his family, raids on his home, and his eventual involuntary commitment to a mental hospital as an alleged schizophrenic.

Earlier, Andrei had discussed his findings with his wife, Evguenia. While Andrei was hospitalized, she and Lena continued trying to publicize the situation, and they succeeded in getting a story published in a local opposition newspaper. Soon after that, the newspaper's offices were destroyed by arson and its editor was severely beaten. Evguenia's family was also targeted: a motorcycle ran her son Vladislav down, breaking his legs, and an anonymous caller told her that her daughter might suffer a similar attack.

At Andrei's request, Evguenia and Ksenia left Kaliningrad in August 1998, entering the United States on tourist visas. (Andrei and Vladislav were both still hospitalized.) Evguenia hoped that the situation in Kaliningrad would eventually return to normal, but instead things got worse. Andrei was released from the hospital, only to be discovered dead a few months later. His body was found doused in vodka on the floor of his sister Lena's home, which suggested to Evguenia that he had been attacked—an anonymous caller had

earlier threatened her that an assailant might exploit her husband's weak heart by "pour[ing] a glass of vodka into him and he will be done." Soon after Andrei's death, his sister Lena was found hanging from a noose. Other family members met comparable fates: Lena's husband was arrested and imprisoned, and Vladislav disappeared altogether.

At their asylum hearing, Evguenia and Ksenia testified concerning the events described in their application and submitted background documentation concerning the political conditions and the widespread corruption in Kaliningrad. They also submitted several documents pertaining to their specific situation, including: (1) Andrei Kidanov's death certificate, identifying the cause of death as "alcoholic cardiomyopathy"; (2) a formal request from the Federal Tax Police for an evaluation of Andrei's professional fitness from the "VTEK Commission" (apparently some sort of ethics review board); and (3) a letter from Irina Bulatova, a former coworker of Andrei's who still lived in Kaliningrad.

During Evguenia's and Ksenia's asylum hearing, the immigration judge occasionally expressed skepticism about their story of persecution. Nevertheless, the IJ found that their testimony was consistent with their written statement, and that the background information they provided adequately established the existence of widespread corruption. The IJ did not, however, make an explicit finding as to whether the testimony was credible. Instead, his analysis focused on the lack of evidence corroborating their claims, specifically their claim that Andrei was killed because of his efforts to expose governmental corruption. The IJ explained why he considered the documents they provided to be inadequate:

> With the exception of [the letter from Irina Bulatova], there is no evidence to indicate that [Mr. Kidanov] was employed [by the Russian] Internal Revenue Service. A review of the letter generally mentions Mr. Kidanov's

death. There is not enough information, assuming the contents of the letter to be entirely true, to support the assertion that Mr. Kidanov was murdered because of his involvement in the investigation.

The IJ went on to identify the kinds of documents he expected:

There are no documents from the tax service, there are no documents from the governor's office, there are no statements other than the one previously mentioned from any other co-workers, no affidavits from friends, no affidavits from acquaintances. . . . [T]here are no documents to show that [Mr. Kidanov] himself was hospitalized.

The IJ also expressed concern about the absence of documents corroborating the allegedly suspicious circumstances in which Andrei and his sister died:

The only document which appears in the file relative to his death is the actual death certificate . . . which simply shows the cause of death as "alcoholic cardiomyopathy." There is no other reference to the circumstances surrounding his death or the suspicious manner in which Ms. Gontcharova believes he died.

Ms. Gontcharova has made [the] claim that Mr. Kidanov's sister also met with foul play, that she was found hanging. There is no letter, newspaper article; there is no document which supports that.

Finally, the IJ was troubled that the petitioners had not presented testimony from a woman Evguenia knew from Kaliningrad who now lived in Chicago, a former neighbor named Irina Bongarenko (the woman, incidentally, who had brought Evguenia her husband's death certificate).

Evguenia offered explanations for failing to produce documents that may have been available to her: when she left Kaliningrad in August 1998, she was fleeing from what she

considered an imminent danger of assault, so she did not have time to gather documentation. She also had not originally intended to apply for asylum, hoping instead that the situation in Kaliningrad would eventually return to normal and she could return safely. She further suggested that the people she knew back home were themselves fearful of government retaliation, and it was therefore difficult to ask them to help her obtain sensitive documents.

The IJ did not address these explanations when he gave his decision, but simply concluded that Evguenia and Ksenia failed to meet their burden of proof—that they "should have provided more specific documentation in order to specifically corroborate their claim to persecution." The IJ therefore denied their requests for asylum and withholding of deportation but granted them voluntary departure. The Board of Immigration Appeals affirmed without comment.

The petitioners now argue that the IJ misapplied the BIA's so-called "corroboration rule." The rule is based on the BIA's interpretation of 8 C.F.R. § 208.13(a), which provides that for purposes of establishing eligibility for asylum, "[t]he testimony of the applicant, if credible, may be sufficient to sustain [her] burden of proof without corroboration." Although on its face this regulation establishes a condition under which corroboration is *not* necessary, the BIA has interpreted the phrase "*may* be sufficient" to mean that the applicant's testimony, though credible, will not *always* be sufficient.

In the case of *In re S-M-J-*, 21 I. & N. Dec. 722 (BIA 1997), the BIA defined the circumstances under which such testimony must be corroborated. Distinguishing between claims that rely on general country conditions and claims that are based on particular experiences of persecution, the BIA declared that where "an applicant's claim relies primarily on personal experiences not reasonably subject to verification, corroborating documentary evidence of the asylum appli-

cant's particular experience is not required." *Id.* at 726. But the Board went on to insist that "where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided." *Id.*

The application of this rule therefore depends on the reasonableness of expecting certain kinds of evidence. The Board provided some guidance for making such a determination. On the one hand, "an asylum applicant should provide documentary support for *material facts* which are *central* to his or her claim and *easily subject to verification*, such as evidence of his or her place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment." *Id.* (emphasis added). On the other hand, "[u]nreasonable demands [should not be] placed on an asylum applicant to present evidence to corroborate particular experiences (e.g., corroboration from the persecutor)." *Id.*

As a further safety valve, the Board allowed that where corroborating documentation is reasonably expected, an applicant who is unable to produce such documentation may instead provide "an explanation . . . as to why such information was not presented." *Id.* The Board offered an illustration:

> [I]f an applicant claims persecution based on her activities as vice-president of a union for 2 years, she should provide some corroborating evidence indicating that she held the office of vice-president or an explanation of why she did not provide such corroborating evidence. The absence of such corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof.

*Id.* at 725-26.

The BIA's interpretation of 8 C.F.R. § 208.13(a) is not the only one possible. The Ninth Circuit, for instance, has declared that it "does not require corroborative evidence . . .

from applicants for asylum and withholding of deportation who have testified credibly," *Ladha v. INS*, 215 F.3d 889, 889 (9th Cir. 2000) (citation and internal quotation marks omitted), and thus rejects the BIA's corroboration rule. The Ninth Circuit interprets the word "may" in the phrase "may be sufficient" to mean only "that sometimes the facts, credibly testified to and taken therefore to be true, will not cover all elements of the asylum or withholding claim needed to justify relief." *Id.* at 901 n.12.

The Second Circuit, in contrast, has endorsed the BIA's interpretation of the regulation, and with it the BIA's corroboration rule. *See Guan Shan Liao v. United States Dept. of Justice*, 293 F.3d 61, 71 (2d Cir. 2002); *Diallo v. INS*, 232 F.3d 279, 285-86 (2d Cir. 2000). Likewise the Third Circuit, while acknowledging that other interpretations of 8 C.F.R. § 208.13(a) are possible, has found the BIA's interpretation to be permissible and worthy of deference. *See Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001); *see also Kayembe v. Ashcroft*, 334 F.3d 231, 238 (3d Cir. 2003) (Cudahy, J., sitting by designation); *see generally* Brian P. Downey & Angelo A. Stio III, *"Of Course We Believe You, But . . .": The Third Circuit's Position on Corroboration of Credible Testimony*, 48 Vill. L. Rev. 1281 (2003).

We have expressed skepticism about the use of the corroboration rule to discount otherwise credible testimony. *See Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003) ("Corroborating evidence is essential to bolster an otherwise unconvincing case, but when an asylum applicant does testify credibly, 'it is not necessary for [her] to submit corroborating evidence in order to sustain her burden of proof.'") (quoting *Georgis v. Ashcroft*, 328 F.3d 962, 969 (7th Cir. 2003)); *see also Kourski v. Ashcroft*, 355 F.3d 1038, 1039 (7th Cir. 2004) (observing "tension" between the BIA's corroboration rule and the language of 8 C.F.R. § 208.13(a)). We have also suggested that the importance of corroboration depends in part on the degree of specificity and detail in a peti-

tioner's story. *See Ahmed v. Ashcroft*, 348 F.3d 611, 618-19 (7th Cir. 2003); *Bevc v. INS*, 47 F.3d 907, 910 (7th Cir. 1995); *Carvajal-Munoz v. INS*, 743 F.2d 562, 577 (7th Cir. 1984).

Nevertheless, we do not reject the BIA's corroboration rule out of hand. In order that we may review its application, however, an IJ must explain his use of it. Such an explanation should include, at a minimum: (1) an explicit credibility finding; (2) an explanation of why it is reasonable to expect additional corroboration; and (3) an account of why the petitioner's explanation for not producing that corroboration is inadequate. *See Diallo*, 232 F.3d at 287.

Each of these elements is missing from the IJ's decision in this case. Although the IJ stated that the petitioners' testimony was consistent with their written narrative and with the established country conditions, he did not say whether he found that testimony to be credible. He identified numerous documents that he thought the petitioners should have produced, but he did not explain why that expectation was reasonable. And he did not address the explanations Evguenia gave for not producing the documentation he expected. These failings alone warrant a remand. *See Diallo*, 232 F.3d at 290 ("[I]n the absence of an explicit credibility finding, an explanation of the need for additional corroboration, and an assessment of [the petitioner's] reasons for his failure to produce further corroboration, we conclude that the BIA's ultimate ruling cannot stand."); *see also Kayembe*, 334 F.3d at 238 (remanding where BIA failed to identify facts that require corroboration); *Abdulai*, 239 F.3d at 555 (same).

Additionally, it is apparent that many if not most of the documents the IJ sought as corroboration were not reasonably available to the petitioners. For example, the IJ noted the lack of evidence that Evguenia's husband Andrei was murdered because of his involvement in the investigation of pervasive government corruption. Although that assertion

clearly is material and central to the petitioners' claim, we do not see how it is "easily subject to verification." *In re S-M-J-*, 21 I. & N. Dec. at 726. It was equally unreasonable for the IJ to have expected documentation (such as letters or newspaper stories) showing that Andrei's sister was murdered: given the established atmosphere of violence and fear in Kaliningrad, it would be surprising to find someone willing to investigate and publicize such an attack. Other requested documents—from the hospital in which Andrei was held against his will; from the tax service that ordered him to drop the investigation; from the governor's office that was being investigated—can only be described as "corroboration from the persecutor." *See In re S-M-J-*, 21 I. & N. Dec. at 725.

The IJ also expected the petitioners to provide corroborating letters and affidavits from friends and acquaintances. This may be a reasonable requirement in general, but in this case Evguenia explained that it was difficult for her to request such help, given the threats and attacks that had been made against people associated with the investigation. In support of this explanation, Evguenia pointed to the letter she received from Irina Bulatova, which described an atmosphere of pervasive intimidation:

> Unfortunately I could not find out anything [about Vladislav, Evguenia's missing son] since our last talk over the phone. Nobody either heard or knows anything at all. It looks like nothing has ever happened, like this topic has simply gone. Currently other things not less terrible are happening: people disappear without a trace, shooting, fights between criminal groups, abducting people for a ransom; everybody, like the Glushkovs [mutual acquaintances], is afraid to open the mouth. When I was at their place his wife kept on kicking him under the table (it was even shaking) for him not to blurt out too much. They know that we kept in touch, that's why they

were not happy when I asked them questions. Now I am more than ever convinced that fear makes people lose what is good in them.

The IJ does not appear to have taken this atmosphere into consideration in finding that the petitioners should have produced corroborating evidence from friends and acquaintances still living in Kaliningrad.

There was one person identified by the IJ who might have been able to testify: Irina Bongarenko, the former neighbor now living in Chicago. Evguenia said that it didn't occur to her that such testimony would be necessary or helpful, but the IJ was unsatisfied by this explanation ("This was an individual who presumably knew the respondent in Kaliningrad, who took some risks to transport documents that purportedly support the respondent's case, yet she was not called as a witness to testify."). It may be true that this former neighbor could have corroborated certain elements of Evguenia's story. But standing alone, the absence of this one piece of potentially corroborating testimony is not a sufficient basis for affirming the IJ's finding. *Cf. Georgis*, 328 F.3d at 970 (declining to defer to an IJ's credibility finding where five of the six stated reasons were either unsupported or were based on improper exclusion of evidence).

Finally, the IJ more or less completely discounted the corroboration the petitioners did provide—the death certificate, the request for an evaluation of Andrei's professional fitness, and the letter from Irina Bulatova. Although the IJ acknowledged this evidence, he made it clear that he considered it to be inadequate. But under 8 C.F.R. § 208.13(a), even as interpreted by the BIA, a petitioner's credible testimony alone can be enough to meet the petitioner's burden of proof when there is no other evidence that can reasonably be expected. Given the unreasonableness of the IJ's evidentiary expectations, we cannot sustain his finding that the petitioners failed to meet their burden of proof.

One last note: The petitioners were granted voluntary departure upon posting of a $1000 bond. When the deadline passed without their departure, the INS declared the money forfeited. In light of our decision today, we direct the government to consider refunding that money to the petitioners.

We GRANT the petitions for review, VACATE the IJ's decision, and REMAND the case for further proceedings. Although the choice of a presiding judge is left to the discretion of the BIA, we urge the BIA to assign a different judge to this case on remand. *Cf.* Circuit Rule 36 of the United States Court of Appeals for the Seventh Circuit. *See also Bace v. Ashcroft*, 352 F.3d 1133, 1141 (7th Cir. 2003); *Georgis*, 328 F.3d at 970.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
