# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3320

VISSINTO K. AYI,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A95-220-244

ARGUED MARCH 29, 2006—DECIDED AUGUST 21, 2006

Before BAUER, KANNE, and SYKES *Circuit Judges.*

BAUER, *Circuit Judge.* Vissinto Kouassi Ayi applied for asylum, contending that he had been persecuted in Togo for his extensive political activities on behalf of the opposition movement. Ayi is a native of Togo and was an active member of both the Togolese League for Human Rights and the Union des Forces du Changement. Both of these organizations are established political and human rights groups opposed to the ruling government. After Ayi had endured two incidents of extended captivity and torture, he learned that a summons had been issued for his arrest. Because he feared for his life, he arranged for his family to go into hiding and he fled the country with the help of his cousin. He entered the United States legally on December

10, 2000. Ayi applied for asylum on November 26, 2001. Because the Immigration Judge's adverse credibility finding is speculative and not based on substantial evidence, we grant Ayi's petition for review.

## I.  Background

Ayi was born in Togo and is a member of the Mina ethnic tribe. He was an engineer, a well-respected businessman, and a member of academia. From early 1991 through the fall of 1993, Ayi worked on various political activities in opposition to the dictatorial regime of President Gnassingbe Eyadema. Ayi wrote articles that were published in opposition newspapers and he joined the Togolese League for Human Rights ("LTDH"), a well-known human rights group. Ayi also traveled throughout Togo to educate others about democracy and human rights.

As a result of his political activities, Ayi was arrested by Togolese security forces on September 11, 1993. He was detained for 15 days and during this detention, he was interrogated, beaten, deprived of food, subjected to electrical shocks, and was forced to kneel on broken palm nuts (which, Ayi explained, is like kneeling on broken glass) in the hot sun for hours, which caused an infection in his knees and resulted in permanent scarring. Although Ayi was eventually released, he was warned by his captors not to report his detention to the press. He was hospitalized for five days after the detention due to the injuries he sustained while in captivity.

After such a traumatic experience, Ayi was not openly political again until 1998. In 1998, he joined the Union des Forces du Changement ("UFC"), which was also an opposition organization that raised awareness and educated people about democracy in Togo. Ayi became active and went door-to-door campaigning on behalf of the UFC's presidential candidate. On March 27, 1999, Ayi was again

arrested and detained. Togolese security forces shoved Ayi in a car at gunpoint and took him to an undisclosed location for two days. During his detention, Ayi was interrogated about his UFC activities, deprived of food and water, and forced into a cesspool of mud and dead animals. When Ayi tried to escape, guards stomped on his hands, causing permanent scarring. He was also forced to bathe in a red liquid that burned his skin and eyes. The guards threatened to kill him repeatedly before his release and warned that he would be harmed if he reported any part of the incident to the press.

Ayi continued his political activities using different means at the Center for Technological and Professional Training ("CNPP") by encouraging and recruiting co-workers to join an independent union, the Confederation of Syndicole Travailers du Togo, rather than the government controlled union. He also wrote articles in opposition to Eyadema's regime. Specifically, Ayi authored two articles, both published in 2000, one in *Le Parole*, and a second in *Le Combat du People*. In 2000, the director of the CNPP and the nephew of President Eyadema, Mr. Kadaring, confronted Ayi about his work for opposition political parties. Ayi had appeared on television denouncing someone and the next day he drafted an article that he submitted to be printed. Somehow, Kadaring received the handwritten article and confronted Ayi about it, asking whose handwriting it was on the article. Kadaring told Ayi that the handwritten article made it clear to him that Ayi had written the articles about Eyadema and his family. Ayi of course denied the charges. On May 24, 2000, Lt. Colonel Takougnadi, the general manager of the police and Kadaring's cousin, called Ayi and said that it appeared Ayi had not "learned" anything from his previous detentions. Lt. Colonel Takougnadi told Ayi to "stop making problems."

In November 2000, vandals broke into Ayi's office at CNPP on two separate occasions. On November 8, 2000, his

car was vandalized and set on fire. After the second break-in, Ayi's cousin, Asheni, told him that a summons had been issued for Ayi's arrest. Ayi sought to leave the country because he feared for his life. With the assistance of Asheni, who was the commander of Togo's airport security, Ayi was able to avoid security problems at the airport and fly to the United States on December 9, 2000. Ayi's wife continued to receive serious threats. Given the nature of these threats, Ayi arranged for his wife to go into hiding with their children near the Benin border. Two days after they had gone, the Ayis' home was searched and many of their personal possessions were confiscated.

Ayi believes that if he were to return to Togo, he would be automatically arrested and imprisoned for his opposition to Eyadema and his family. (Since Ayi left, Eyadema's son, Faure Gnassingbé, has taken over as President of Togo). Ayi's family tells him that he is still in danger and that government forces have been looking for him. Ayi's brother, Virgil Kouassi Ayi, went to Benin to visit Vissinto Ayi's wife and children. Virgil was arrested at the border control because the officers though that he was Vissinto Kouassi Ayi. Virgil was held for 15 hours before the border control finally believed that he was Vissinto's brother.

Ayi filed for asylum on November 26, 2001, which is within the one-year statutory deadline required by 8 C.F.R. § 1158(a)(2)(B). Following an agency interview, Immigration and Naturalization Service ("INS") rejected Ayi's asylum application. The INS then referred Ayi's application to an immigration court, together with a notice to appear that charged Ayi with unlawfully remaining in the United States after his visa had expired. Ayi opposed his removal under the previously filed asylum application and sought withholding of removal, relief under the Convention Against Torture, and alternatively, voluntary departure. He appeared before the IJ for a merits hearing on his asylum application on March 23, 2004. The merits hearing was

continued until September 27, 2004 and Ayi again attempted to present testimony and documents in support of his case. On November 1, 2004, the IJ issued a written ruling denying all requested relief. The IJ concluded that Ayi was not credible because there were inconsistencies about Ayi's political involvement that the IJ believed undermined his claim. Ayi appealed the IJ's decision and the Board of Immigration Appeals adopted and affirmed the IJ's ruling on July 13, 2005. This appeal timely followed.

## II. Analysis

We focus on the IJ's credibility finding since the remaining issues on appeal depend on this adverse ruling. When the BIA does not issue an opinion, but rather, as it does here, summarily affirms and adopts the IJ's opinion, we review the IJ's decision as the final agency determination. *Georgis v. Ashcroft*, 328 F.3d 962, 966-67 (7th Cir. 2003). Since Ayi filed his asylum application prior to passage of the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231, that statute does not affect the credibility analysis in this case. *Diallo v. Gonzales*, 439 F.3d 764, 766 n.1 (7th Cir. 2006). We will affirm an adverse credibility determination only where it is "supported by specific cogent reasons that bear a legitimate nexus to the finding." *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003). While we give great deference to the IJ's credibility determination, "adverse credibility determinations should not be grounded in trivial details or easily explained discrepancies" because such bases lack a legitimate nexus to the finding. *Korniejew v. Ashcroft*, 371 F.3d 377, 387 (7th Cir. 2004) (citation omitted).

The IJ concluded that Ayi's testimony was unconvincing as to his 1993 detention. Ayi explained that he was targeted in 1993 for writing an article critical of President Eyadema and for his political activities. The IJ was critical

of Ayi's testimony and wanted Ayi to provide a clear and convincing explanation for how his persecutors knew he authored articles critical of President Eyadema's government. Yet, our precedent understands that Ayi is not capable, nor is expected, to testify to the knowledge of other persons, particularly when called to testify about the knowledge of his oppressors. *Gontcharova v. Ashcroft*, 384 F.3d 873, 877-78 (7th Cir. 2004) (denial of asylum overturned where decision was partly based on absence of documents not reasonably available to petitioner and described as "corroboration from the persecutor.") For an IJ to deny an asylum claim for lack of corroboration and demand such evidence from the applicant, the IJ "must first make an express credibility finding." *Diallo*, 439 F.3d at 765-66 (citation omitted). The IJ must also "explain why it is reasonable to expect corroboration and explain why the applicant's reason for not supplying corroboration is inadequate." *Id.*; *see also Gontcharova*, 384 F.3d at 877.

The IJ improperly expected Ayi to explain how his persecutors knew he was the one who had written the article critical of Eyadema's government. His persecutors may or may not have known that Ayi was the ghostwriter of the opposition articles, but their targeting of him may have been the result of his education and outreach efforts on behalf of the LTDH. Ayi testified that he was persecuted in 1993 for political activities that included traveling throughout Togo to educate others about democracy and human rights, which singled him out as an opposition political activist. Despite the fact that Ayi offered thorough and consistent testimony that in June 1993 he had written an article opposing the government, and that he was unable to provide a copy of the article because the police seized all of the opposition papers and the publisher is no longer in business, the IJ questioned the veracity of Ayi's testimony. Ayi, however, provided corroborating evidence in the form of a letter from Lucien Messan, the director of the publica-

tion itself. For reasons unclear to us, the IJ discredited the letter from Messan, where he stated that Ayi wrote opposition articles for his publication. Messan's letter also gave the pen name that Ayi used, "Rodrigue," which corresponds with the author of the articles that Ayi submitted in his application. Without basis in law, the IJ determined that Mr. Messan's letter should have provided the exact dates and titles of Ayi's articles in order to establish that Ayi had written them. Ayi also offered the affidavit of Marcel Adjalla, the former Executive Secretary of the LTDH, which stated that Ayi wrote for various independent newspapers and that he was an active member of the LTDH. Given the seizure of the articles and the subsequent closing of the publication, Ayi's testimony and explanations are not incredible and, actually, appear to be the types of "easily explained discrepancies" that should not be the basis for an IJ's adverse credibility finding. *Korniejew*, 371 F.3d at 387.

The IJ next doubted Ayi's belief that he would be persecuted if he was forced to return to Togo. Noting that Ayi took a business trip to the United States in 1998, the IJ questioned why Ayi did not apply for asylum then if he suffered such terrible persecution in 1993. Ayi's uncontroverted testimony is that his 1993 detention and the torture he endured during it scared him to the point that he stopped his political activities for five years. When Ayi was asked why he did not apply for asylum when he was in the United States in 1998, Ayi explained that at the time of his business trip "he did not feel openly harassed." The IJ disregarded, without explanation, the fact that Ayi had ceased his political activities after his detention in 1993. Discrediting Ayi's testimony for speculative reasons, the IJ concluded that if Ayi's torture was as terrible as he claimed, he would have applied for asylum in 1998 regardless of how much time had passed since Ayi was openly political and targeted.

What the IJ fails to understand is that Ayi's hiatus from political activity—and thus from persecution—does not

diminish his credibility. Avoiding persecution for even an extended period of time is not relevant to a credibility determination. *Hor v. Gonzales*, 421 F.3d 497, 499 (7th Cir. 2005) (vacating credibility determination based on IJ's own suspicion regarding length of time between dangerous encounters with persecutors). *See also Dong v. Gonzales*, 421 F.3d 573, 578 (7th Cir. 2005) ("It is not relevant to [applicant's] credibility that she avoided persecution during the four years she remained in China.").

Moreover, the IJ failed to mention the fact that Ayi's second detention came *after* the business trip to the United States. Ayi became politically active again in 1998 and was detained and tortured on March 27, 1999. The second detention subjected Ayi to horrific torture. Significantly, Ayi was submerged in a cesspool of mud and dead animals and when he tried to escape, the guards stomped on his hands, which caused permanent scarring. He ultimately fled Togo when he was notified that a summons had been issued for his arrest in November of 2000. The IJ needed to view Ayi's entire history of political activity as a seamless story, not as finite periods of time that were mutually exclusive of each other. As the Board of Immigration Appeals has explained, "[t]estimony is not a discrete, self-contained unit of evidence examined and weighed without context; it is a part of the body of evidence which is intertwined and considered in its totality." *Lin v. Gonzales*, 446 F.3d 395, 402 (2d Cir. 2006) (*quoting In re S-M-J-*, 21 I & N Dec. 722, 729 (BIA 1997)).

The IJ also discredited Ayi's testimony about his employment at a state-run educational institution. He concluded that Ayi had not produced evidence proving that university officials were responsible for breaking into his office on several occasions and eventually vandalizing and setting fire to his car. The IJ also held that Ayi had not produced evidence proving that university officials were aware of his political activities, including whether the officials knew he

had written articles in opposition newspapers. He also wondered how Ayi was able to keep his job if his employers were really targeting him for his political activities.

The IJ's findings regarding Ayi's job amount to conjecture and speculation rather than conclusions that are grounded in the record. The IJ's conclusions about Ayi's employer illustrate this point. Ayi offered consistent and detailed testimony regarding his political activities at work, and the threats he received from the director of the CNPP as well as others in the government.

Specifically, Ayi testified that he was confronted and threatened about his political activities by Mr. Kadaring, the CNPP director and nephew of President Eyadema. Kadaring asked Ayi if he had written the opposition articles and Ayi denied authoring them because he feared for his safety. In addition, Lt. Colonel Takougnadi, the general manager of the police and Mr. Kadaring's cousin, called Ayi and told him that it seemed that Ayi had not "learned" anything from his previous detentions. Despite this testimony, the IJ questioned how Ayi's employers knew that he was involved in the opposition, stating that, "[t]here is no evidence to suggest that the director suspected that the Respondent wrote the articles against Eyadema because the Respondent denied writing them to the director." This statement is breathtaking in its contradiction with the record. Given the threats that Ayi received from the director and the general manager of the police about authoring opposition articles and political activity, it is considerably clear that Ayi was suspected as a political activist and writer. Additionally, the IJ claimed that if Ayi's superiors truly wanted to punish him, surely he would have been fired. Yet, Ayi explained that the CNPP could not run the school without him because he had specialized training and education. The IJ dismissed this explanation, stating that Ayi's testimony is undermined by the fact that after Ayi fled Togo, he was replaced by someone that the CNPP had sent

to be trained in Germany to gain the same set of skills as Ayi. While Ayi was replaced, we fail to see how the IJ disregarded the fact that in order to replace Ayi, the CNPP needed to send someone to Germany for specialized training. This fact in the record demonstrates that Ayi's skill was hard to come by. Essentially, it seems that the IJ's credibility assessments are the kind we cannot uphold because they are "unmoored from the record, [and are] based on nothing but the IJ's personal speculation or conjecture." *Tabaku v. Gonzales*, 425 F.3d 417, 421 (7th Cir. 2005).

In his findings, the IJ also discredited Ayi's testimony as to how he fled Togo. The IJ wondered how Ayi was able to leave Togo unimpeded if there was a summons for his arrest. The IJ placed significant weight on a letter Ayi had received from his cousin, Asheni, warning him to leave immediately but asking Ayi not to contact him. During his testimony Ayi explained that his cousin was able to help him through security at the airport. Ayi stated, "An[ ] Airport in Togo cannot be compared to the airport in the United States. My cousin is responsible for the security in the airport, everyone knows him." At oral argument, the government conceded that Asheni's letter could have meant any number of things, including that Asheni would help Ayi but that Ayi should not contact him.

The IJ's conclusions regarding Ayi's departure are mere speculation and conjecture, which does not support an adverse credibility finding given the record in this case. *Chen v. Gonzales*, 420 F.3d 707, 710 (7th Cir. 2005). We have consistently explained to the Immigration Court that while their credibility determinations are due deference, they must be "supported by reasonable, substantial, and probative evidence on the record considered on a whole.*" INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Considering Ayi's cousin was the head of security at the airport, Ayi's explanation for his departure is reasonable and is

not contradicted by probative evidence in the record considered as a whole.

Finally, the IJ decided that a "paper disturbance," as described by the Forensic Document Laboratory Report, on Ayi's UFC membership card constituted a forged document. The IJ concluded that the "paper disturbance" on the card, which showed a difference between the type style in the name "Kouassi," and the type style of the rest of the card, meant that the membership card was a counterfeit. The IJ therefore decided that Ayi's testimony was not "credible in the face of a forged document because the UFC membership card relates to a material element of his asylum claim."

Yet, Ayi has explained that the "paper disturbance" (which, notably, the Forensic Document Laboratory Report labeled as a "paper disturbance" *not* a forgery) on the card was the result of his middle name, Kouassi, added to the membership card after it was initially issued to Ayi. Similar to the surname "Smith," or, even "Bauer," in the United States, Ayi explained that his surname is very common in Togo, which is why he wanted his middle name added to the membership card. Further, Ayi submitted a letter from the Vice President of the UFC, Emmanuel Bob-Akitani, that certified Ayi as a member.

In *Uwase v. Ashcroft*, we held that a similar conclusion about a document was equally unfounded. 349 F.3d at 1042. Uwase did not explain the presence of a rubber stamp near the signature line of a letter that told the applicant she would be killed, and thus the IJ had found that her entire story of persecution was incredible. In vacating the IJ's order of removal, we stated that "[t]he IJ's speculation regarding the significance of the stamp, unsupported in the records, does not form a valid, cogent reason for a negative credibility finding." *Id.*

Similarly here, the IJ's determination that the UFC card was a forgery based on what the Forensic Document

Laboratory Report deemed only to be a "paper disturbance" is a speculative leap. Moreover, the difference in typeface on the card indicates a lack of technology available to the UFC: "The notion that documentation is as regular, multicopied, and ubiquitous in disordered nations as in the United States, a notion that crops up frequently, is unrealistic concerning conditions actually prevailing in the Third World." *Hor v. Gonzales*, 421 F.3d 497, 501 (7th Cir. 2005) (citation omitted). The IJ also disregarded the wealth of corroborating evidence in the record that supports Ayi's political activities and membership in the opposition movement. In addition to his own consistent and thorough testimony, Ayi provided the IJ with his LTDH Membership card and two letters corroborating his political activities on behalf of the UFC. Ayi also provided the IJ with copies of his pen-named articles, the summons for his arrest, and the letter from his cousin indicating that he should flee.

The corroborating evidence that Ayi offered was either dismissed by the IJ as raising more questions than answers or considered as not enough. But the IJ did not explain, as *Diallo* and *Gontcharova* require, why it was reasonable to expect the corroboration he wanted, nor did he explain why the applicant's reason for not supplying the desired corroboration was inadequate. *Diallo*, 439 F.3d at 765-66; *Gontcharova*, 384 F.3d at 877. We have held that the "IJ's skepticism—utterly unsupported by any facts in the record—with respect to [petitioner's testimony] does not form a valid basis for a negative credibility determination in the face of other corroborating evidence . . . presented." *Lin v. Ashcroft*, 385 F.3d 748, 755-56 (7th Cir. 2004). The IJ's speculation, which was not grounded in the record, is inappropriate. Since the IJ's credibility determination was not supported by specific cogent reasons that bear a legitimate nexus to the finding, it cannot be upheld.

Troubling to us is the surprising lack of regard for the rich record in this case coupled with the fact that at least

parts of the IJ's opinion appear to be a "cut and paste" job from previous opinions.[1] While Ayi offered an affidavit from his treating physician (who noted the scarring and damage on Ayi's hands and knees), the IJ's opinion does not mention this corroborating evidence nor does he explain if or why it was excluded. Our concern is not new, *Pasha v. Gonzales,* 433 F.3d 530 (7th Cir. 2005); *Benslimane v. Gonzales*, 430 F.3d 828, 829-30 (7th Cir. 2005), but unfortunately, it has not abated.

The remaining arguments in Ayi's appeal need not be addressed at this time since we find that the IJ's credibility determination was not based on substantial evidence. We therefore remand his petition to the Board of Immigration Appeals for proceedings consistent with this opinion.

## III.  Conclusion

For the foregoing reasons, Ayi's petition for review is GRANTED and this case is REMANDED to the Board for proceedings consistent with this opinion.

---

[1]  Specifically, the IJ refers to Ayi as a "her" twice in the opinion: "Therefore the Court must rely on the corroborating evidence to determine whether the Respondent has met *her* burden of establishing eligibility for asylum. The corroborating evidence in this case, rather than supporting *her* claim, raises additional questions." IJ opinion at 10 (emphasis added).

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*