In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-4683

AHMED M. DOUMBIA,

*Petitioner*,

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A97 101 783

ARGUED NOVEMBER 1, 2006—DECIDED JANUARY 4, 2007

Before KANNE, EVANS, and SYKES, *Circuit Judges*.

EVANS, *Circuit Judge*. Ahmed Doumbia has filed a petition for review of an order directing his removal to Cote d'Ivoire (his home country) and denying his applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). After a hearing, an immigration judge (IJ) found that Doumbia's claims were not credible and that, even if they were, he failed to establish eligibility for asylum on the basis of past persecution or a well-founded fear of future persecution. That conclusion necessarily rendered him ineligible for withholding of removal and CAT relief, both of which require a higher threshold for eligibility. The Board of Immigration Appeals (BIA) subsequently adopted and affirmed the IJ's decision.

Cote d'Ivoire (formerly known in English as Ivory Coast) was led for much of its contemporary history by Félix Houphouët-Boigny, who served as president of the republic and leader of the *Parti Democratique de la Cote d'Ivoire* (PDCI) from the country's independence in 1960 until his death in 1993. In 1994, members of the PDCI's reformist wing left the party to form the *Rassemblement des Republicaines* (RDR). The PDCI and RDR operated as the country's two main political parties until late 1999, when a bloodless Christmas Eve coup brought General Robert Guei to power. Guei's government drafted a new constitution and scheduled open elections for the fall of 2000. After a Guei-influenced decision by the country's Supreme Court disqualified all of the PDCI and RDR candidates, the two parties boycotted the election, leaving a race between Guei and the eventual winner and current president, Laurent Gbagbo. Gbagbo represented what had been the country's oldest opposition party, the *Front Populaire Ivoirien* (FPI).

Doumbia asserts the following facts. He was born in 1973 in Abobo, a district of Abidjan, Cote d'Ivoire's administrative center and de facto capital. A member of the Djoula ethnic group, his interest in politics began while helping his mother, who served from 1989 to 1993 as a member of the PDCI responsible for the mobilization in Abobo of women and young people to join the party. In 1999, Doumbia attempted to enter the United States by falsely claiming he was a French citizen and presenting someone else's passport, all in an effort to apply for asylum. He was denied entry, returned to France, and eventually sent back to Cote d'Ivoire.

He then enrolled at the University of Cocody, where he was appointed by his older brother as head of the school's chapter of the Student Federation of Cote d'Ivoire Schools (FESCI, in French). In that capacity, he helped to organize a student rally (in July 2002) to both demand the

student room and board stipend that had not been received for 6 months and more generally denounce the abuses and bad management of the ruling FPI. During the rally, Doumbia and some of his fellow demonstrators were attacked by government forces and possibly the university's student members of the FPI. (The IJ found inconsistencies between Doumbia's asylum application and his testimony on this point.) They were forced to strip naked and swim in a nearby creek (although Doumbia apparently resisted and had his clothes torn), detained, and held together in an uncomfortable cell. The next day they were separated and given bread and water; Doumbia was ultimately released after 3 days.

Soon after, Doumbia received three summonses requiring his appearance at the local police station. He offered copies of these summonses as corroborating evidence and explained that they were issued successively on July 14, 15, and 17 by the same police commissioner. Doumbia did not respond to the summonses. Two months later, he left Cote d'Ivoire in a renewed effort to enter the United States. He again provided false documentation at entry, using a friend's passport. This time the deception was not detected, and Doumbia was admitted into the United States.

A few months later he applied for asylum and other relief, alleging that he feared persecution and torture based on the events of the July 2002 rally and the subsequent issuance of the three summonses. He also alleged that he was fearful because of the continued efforts of his older brother (now living in France) on behalf of FESCI and because he believes that his father was killed by government forces while at a mosque in 2002.

Doumbia's applications for relief were considered at an immigration hearing, at which he offered testimony and was cross-examined by an attorney for the government. He

introduced other evidence to corroborate his testimony, including RDR membership cards allegedly issued in 1994 and 2002, the three police summonses from July 2002, his father's death certificate, and information on his brother's activities. He also offered the testimony of two witnesses: Hanna A.B. Jones (a history professor at Chicago State University and former Liberian ambassador to the United Nations) and Inza Couibaly (a permanent resident of the United States who had grown up in Cote d'Ivoire near Doumbia and his family). Because the IJ was particularly concerned about the validity of the summonses, the hearing was twice continued, such that although it began in August 2003, it did not conclude until August 2004.

Ultimately, the IJ issued a decision denying Doumbia's applications for relief and ordering his removal to Cote d'Ivoire. He explained that he did not find Doumbia to be credible and that he believed the offered corroborating evidence only hindered Doumbia's case. He also concluded that even if the claims were true, Doumbia was not eligible for asylum or other relief because he had neither suffered from past persecution nor demonstrated a well-founded fear of future persecution.

The IJ offered several bases for concluding that Doumbia was not credible. He explained that he was troubled by a number of inconsistencies between statements in the asylum application and the testimony offered at the hearing. The IJ noted that Doumbia stated in his asylum application that the July 2002 rally took place "in the Campus of Cocody," while at his hearing he described the location of the rally as the Marakana stadium on the campus. The IJ also pointed out that the application explained that the attack at the rally was carried out by "government forces and the student's members of the FPI youth" using "batons, knives, and machetes," but that at the hearing Doumbia made no further mention of knives or machetes. When the IJ questioned him as to whether

it was soldiers and students who had attacked, Doumbia testified that they "were attacked by soldiers, by gendarmes who had come from Laurent Gbagbo." Finally, the IJ noted that Doumbia's application made no mention of anyone being beaten at the time he and the other detainees were separated and placed in individual cells on their second day in custody. Yet, at his hearing, Doumbia testified that when he and the others were broken up, they were beaten by a club with a long cord.

With respect to the documentary evidence, two problems arose. First, the IJ had doubts about the validity of what was alleged to be Doumbia's 1994 RDR membership card. The photograph on the card of Doumbia's face also contains the image of a grommet in the top left-hand corner, suggesting that the photo had derived not from a negative but from a secondary photo of an earlier photograph. The IJ questioned him at length about where he had gotten the image and why it contained a grommet but was unmoved by Doumbia's attempted explanation. He testified only that he had returned to the photographer who had taken the picture (and presumably had the negatives) to get another copy in order to save money. He denied that this was a photograph of another photograph and insisted instead that the grommet was merely an object hanging on the wall behind him at the location where the photograph was taken. The IJ rejected this testimony and also pointed out that a senior forensic document examiner for the Department of Homeland Security had examined the image and concluded it to be a photograph of a photograph.

Second, the IJ determined that the three summonses Doumbia submitted were false. Initially, only one summons was provided to the IJ in the record. Then, at his hearing, Doumbia testified that he had received three summonses dated July 14, July 15, and July 17, each of which required him to appear before the police the next

business day—apparently the standard practice in Cote d'Ivoire. While all of the summonses were signed and stamped on the corresponding date, each also bore the date July 14 at the top of the document. Asked to explain this, Doumbia insisted that the date of the first summons remains on every summons issued thereafter, and it was therefore normal for the July 14 date to appear at the top of each subsequent summons.

In an attempt to clarify the issue, the IJ decided to continue the case, allowing more time for the gathering of information about the summonses. In an effort to gauge their veracity, the IJ sent the summonses to the U.S. Embassy in Cote d'Ivoire for a State Department investigation. The Embassy's investigator, a former Ivorian police officer with law enforcement contacts, concluded that the summonses were phony because the police commissioner whose stamp appeared on them was not in office at the time they were "issued" and because lines on the summonses repeated themselves, suggesting a botched attempt at forgery. A letter sent to the IJ describing these findings attached a copy of an authentic Cote d'Ivoire summons, which did not bear these repeated lines. Confronted with these results, Doumbia was granted a continuance to enable him more time to gather evidence in rebuttal. When the hearing reconvened months later, Doumbia presented summonses that other Ivorians had received in an effort to demonstrate that the dating on his own summonses was consistent and that different standard forms are used in different places. Still, as the IJ noted, the new evidence failed to explain the use of the wrong police commissioner's stamp and the presence of repeated lines, which were found only on Doumbia's summonses.

The IJ also found that Doumbia's two witnesses did not support his claims. He found that Jones was an expert on Liberia, not on Cote d'Ivoire, and that although she

offered some helpful background testimony, her knowledge about other aspects of Cote d'Ivoire's recent political history was lacking. In addition, she readily admitted that her testimony was based on the assumption that Doumbia was credible—she could therefore offer no help to the IJ on that issue. As for Couibaly, the IJ found that his testimony only further undermined Doumbia's case: he testified that Doumbia was holding meetings for the PDCI in 2002 despite the fact that Doumbia had never alleged membership in the PDCI, which we have already noted is a political party distinct from the RDR. Couibaly also testified that he had heard of Doumbia's problems with the government during a visit to Cote d'Ivoire in the summer of 2002. Believing that this visit occurred prior to the July 2002 rally that Doumbia claims was the real beginning of his problems, the IJ held that this too undermined Doumbia's credibility.

Finally, the IJ held that even if Doumbia's testimony were credible, he had failed to establish eligibility for asylum by demonstrating either past persecution or a well-founded fear of future persecution. The IJ determined that Doumbia's claims that he was detained for 3 days in poor conditions and beaten with a long cord did not rise to the level of past persecution. The IJ also found that Doumbia had no objective fear of future persecution on the basis of political opinion because of recent efforts at reconciliation between the country's main political parties and the presence of RDR members in the government. Likewise, the IJ concluded that he had failed to establish any likelihood of future persecution on the basis of his ethnicity because his allegations that his father was killed for being a Djoula was unsupported by any specific testimony from Doumbia or anything in the record, and because there was no evidence upon which to conclude that Doumbia's brother's activities in France were likely to cause Doumbia any harm.

Doumbia argues that the IJ, as affirmed by the BIA, made several errors that should compel us to send the case back for a more thorough development of the record. Although his brief is not exactly clear, we take Doumbia to be making three arguments. First, he argues that the IJ erred by relying on certain evidence that should not have been considered and that Doumbia was not given a fair opportunity to rebut; second, he argues that the IJ erred in making an adverse credibility finding; third, he disputes the IJ's conclusion that he had failed to demonstrate past or potential future ethnic or political persecution.

We review the decision of the BIA, but where the Board, as it did here, has adopted and affirmed the IJ's decision without more, the basis for our review is the IJ's decision. *Niam v. Ashcroft*, 354 F.3d 652, 655-56 (7th Cir. 2004).

With respect to the evidentiary matters, Doumbia argues that the IJ was wrong to rely on the results of the State Department's investigation into the validity of the three summonses. He invokes our decision in *Pasha v. Gonzales*, 433 F.3d 530 (7th Cir. 2005), and insists that the report of the investigation results is impermissible hearsay that should have been subject to some form of cross-examination by Doumbia's attorney; he also argues that the investigator's status as a former Ivorian police official biased him against Doumbia's claim. Finally, Doumbia adds that the DHS forensic report about the membership card photograph was improperly "sprung" on him because it was not shown to his attorney prior to his hearing but was cited by the IJ in his decision.

In his briefs to the BIA and to us, Doumbia offers no real legal framework to analyze these issues; he says only that these evidentiary decisions were prohibited by *Pasha* and they were unfair. But *Pasha* dealt with the reliance by an IJ on unreliable expert testimony—testi-

mony related to a subject about which the expert was, by his own confession, ignorant—and it provides little guidance about the legal rules we are to apply to inadmissibility challenges outside of that particular set of facts.

In immigration proceedings, "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government . . . ." 8 U.S.C. § 1229a(b)(4)(B). Doumbia's complaints, then, are really a claim that this provision was violated. Unfortunately, no one seems to have noticed that, in its order dismissing Doumbia's appeal, the BIA never explicitly addressed this argument; it simply reviewed the IJ's credibility determination and agreed that it was supported by substantial evidence. The absence of any express discussion of this issue would not trouble us if the BIA had, as it often does, simply affirmed and adopted the IJ's decision without further opinion, as it is authorized to do under 8 C.F.R. § 1003.1(e)(4). But in this case, the BIA proceeded under § 1003.1(e)(5) and issued a brief order affirming the IJ's decision, so we cannot simply assume that in getting to the merits of the IJ's credibility determination the BIA also concluded "that any errors in the decision under review were harmless or nonmaterial . . . ." *Pasha*, 433 F.3d at 534 (quoting 8 C.F.R. § 1003.1(e)(4)(i)).

In the typical case, such an oversight requires our remand so as to ensure the exhaustion of all administrative remedies. But to do that here would be to reward the real "wrongdoer," Doumbia, whose muddled briefs at both levels of appeal are the clear culprit for this confusion and who has raised no objection to the BIA's failure to expressly consider the issue. In fact, it is clear to us that Doumbia's lawyer never realized he was making a § 1229a(b)(4) challenge (or even a "flabby" constitutional challenge, *see Rehman v. Gonzales*, 441 F.3d 506,

508 (7th Cir. 2006) (noting the tendency of immigration counsel to make overly broad due process challenges in lieu of focusing on the statutory or regulatory requirements)). At the same time, we cannot say that Doumbia has waived the argument by failing properly to raise it before the BIA—that would be like stumbling upon a needle in the haystack and then putting it back in and pretending never to have seen it. For its part, the government recognizes the due process-like nature of Doumbia's complaints about the admissibility of certain evidence, meets that argument head on, and expresses no concern that Doumbia has not properly raised this claim before. Lacking these objections, we see no reason why we should avoid proceeding to the merits.

The promise of a reasonable opportunity offered by § 1229a(b)(4) should not be confused to mean that the Federal Rules of Evidence apply in immigration proceedings—they do not. *Niam v. Ashcroft*, 354 F.3d 652, 658-59 (7th Cir. 2004). Rather, "[t]he sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair," *Espinoza v. INS*, 45 F.3d 308, 310 (9th Cir. 1995) , where "fundamentally fair" should simply be read to mean "in accordance with the reasonable opportunity guaranteed by § 1229a(b)(4)."[1]

Upon applying this standard, it is clear that both the letter describing the Embassy's investigation and the DHS forensic report are probative. Doumbia has offered no evidence to raise doubts about the validity of these materials other than to question the political loyalties of the

---

[1] To require anything more for admissibility in a given case to be "fundamentally fair" would be to forget that § 1229a(b)(4) already marks due-process-compliant limits on a noncitizen's rights in removal proceedings. *See, e.g., Rehman*, 441 F.3d 506, 508 (7th Cir. 2006).

former Ivorian police official employed by the U.S. Embassy as its investigator. On that score, Doumbia relies only upon a generalized assumption that any former police official might be biased in favor of the current government—a particularly dubious belief considering the current ruling party only came to power in 2000. For all we know, the former police official may have taken on "former" status because he was a member of Doumbia's own RDR party when the regime changed. Doumbia offers nothing specific about this former official. Unsubstantiated generalizations without more are not enough for us to question the reliability of evidence—especially when that evidence consists of official U.S. Government reports.

The fact that the evidence comes from official reports also resolves whether their admission was fundamentally fair. Any argument that the admissibility of the Embassy report was unfair fails upon the realization that even if Doumbia's proceeding were subject to the protections of the Federal Rules of Evidence, official reports like these would be admissible despite their status as hearsay and regardless of the availability of any opportunity to cross-examine the authors. *See* Fed. R. Evid. 803(8)(C). The admissibility of the report is therefore also unaffected by Doumbia's inability to question the Embassy investigator. As for the argument that the forensic report was "sprung" on Doumbia, we would only be concerned about fairness if such an error (if there was one) prejudiced the result. *Rehman*, 441 F.3d at 509; *see also United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 157 (1923) ("[A deportation] hearing granted does not cease to be fair, merely because . . . some evidence has been improperly rejected or received."). The IJ's own review of the disputed photograph and direct questioning of Doumbia indicates that he believed the membership card to be invalid regardless of the availability of the forensic report.

Having concluded that Doumbia's hearing comported with § 1229a(b)(4), we turn to the IJ's credibility determination, which is entitled to our highly deferential review. *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003). We look for substantial evidence—specific, cogent reasons that bear a legitimate nexus to the IJ's finding. *Ayi v. Gonzales*, 460 F.3d 876, 880 (7th Cir. 2006). To prevail, Doumbia is required to show "not merely that the record evidence supports a conclusion contrary to that reached . . . but that the evidence compels that contrary conclusion." *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir. 1997) (citing INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1 (1992)).

Although we might not have placed as much emphasis as did the IJ upon the cited inconsistencies between Doumbia's testimony and his asylum application (saying a rally was held on a campus versus saying it took place at a stadium is trivial at best), we have no doubt that the IJ's conclusion that Doumbia was not credible is supported by substantial evidence. We have already discussed the IJ's concerns regarding the submission of false summonses and the doctored RDR membership card. This evidence goes right to the heart of Doumbia's claims that he was targeted by the government for political persecution. The IJ's conclusion that these items were phony provides a clear basis for not setting aside the IJ's finding that Doumbia was not a credible witness.

Because we will not disturb the IJ's determination that Doumbia was not credible, we need not examine the alternative holding that he failed to demonstrate past persecution or a well-founded fear of future persecution on the basis of either political opinion or ethnicity. In any event, there is scant credible evidence offered to support the conclusion that Doumbia has direct ties to the RDR, or that such ties would in any event put him in future danger. As to the claims about his brother's activities

and his father's death, Doumbia has failed to provide any evidence connecting those facts to persecution; we have also previously made clear that an asylum applicant "cannot rely solely on the persecution of [his] family members to qualify for asylum . . . ." *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003) (citation omitted).

For the foregoing reasons, the petition for review is DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*