In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-1391

COLCER RAPHEAL,
a/k/a ASHLEY AMBER MANNING,

*Petitioner*,

*v.*

MICHAEL B. MUKASEY, Attorney
General of the United States,

*Respondent.*

_____

On Petition for Review of an Order
of the Board of Immigration Appeals.
No. A99-024-532

_____

ARGUED NOVEMBER 2, 2007—DECIDED JULY 2, 2008

_____

Before MANION, ROVNER, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Colcer Rapheal sought asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). An Immigration Judge ("IJ") denied Rapheal's petitions, finding that she was not credible and that without any evidence to corroborate her claims of persecution and torture, she failed to establish a right to relief. Rapheal appealed to the Board of Immigration Appeals ("Board"), and the Board affirmed based solely on the lack of corroborative evidence. Because

Rapheal's hearing before the IJ did not conform to statutory requirements, we grant the petition for review and remand for a new hearing.

I.

Colcer Rapheal is a native and citizen of Liberia. On January 6, 2006, Rapheal flew from Germany to the United States and illegally entered the United States in Chicago, using a false United States passport issued to "Ashley Amber Manning." Rapheal initially claimed that she was Manning and presented both a passport and a driver's license in Manning's name. Only after immigration officers spoke with the real Manning by phone did Rapheal admit that the passport was false. Rapheal, who had been living in Nigeria and was also a citizen of Nigeria based on her marriage to a Nigerian, then told immigration officials that she was afraid to return to Nigeria.

After the airport interview, on January 25, 2006, the Department of Homeland Security ("DHS") issued Rapheal a Notice to Appear ("NTA"), charging her with removability as an alien who sought to procure admission to the United States by fraud or willful misrepresentation of a material fact, and falsely representing herself to be a United States citizen. Rapheal admitted to removability, and the IJ found Rapheal removable as charged and designated Germany, or alternatively Liberia, as the country of removal.

Rapheal then applied for asylum, withholding of removal, and CAT relief. On March 1, 2006, the IJ held a hearing via video conference, at which Rapheal presented evidence and testified in support of her petitions.

Rapheal stated that her father, Michael Rapheal, was a well-known doctor for former Liberian President Charles Taylor and was "very active" in his regime in Liberia. This conflicted with a handwritten notation added to a typed immigration form stating that Rapheal's maiden name was Colcer Kocoker. The signature "Rapheal" appears next to the added handwritten notation, as it does at the end of the form. Rapheal also claimed that her family was well known in Liberia as supportive of Taylor because her father and mother often appeared in newspaper photographs along with Taylor. Rapheal further testified that rebels blamed her father for acting as a voodoo doctor for Taylor, using his skills to help Taylor "use voodoo to trick and charm" Liberians, and that she was forced to flee Liberia after the rebels murdered her family and seriously injured her.

After fleeing Liberia, Rapheal went to a refugee camp in Nigeria. Rapheal testified that while at the refugee camp she was raped multiple times by camp guards and when she resisted, the guards hit and burned her with a metal rod. Rapheal also testified that a guard at the camp cut her thumb off so that she could have a "taste of the pain" that Taylor caused the Nigerian people. She later married a Nigerian, John Clifford Bernard, whom she had met at the camp, and together they had two children. Bernard was murdered and then her children were killed in a fire. Rapheal claims the fire was purposely set by Nigerian government agents because of her husband's political activities.

The IJ found that Rapheal was not credible because she had earlier told immigration officers that her maiden name was Kocoker. Although Rapheal testified that she had never heard the name Kocoker before, the IJ found

her testimony not credible given that she had signed the earlier statement listing her maiden name as Kocoker. The IJ determined that the inconsistencies relating to her name and identity went to the heart of her claim that she would be harmed in Liberia because the "vast majority" of her claim "rests on her assertion that the Rapheal name is well-known as a supporter of Charles Taylor." Further, the IJ noted that Rapheal had failed to submit any corroborative evidence relating to her identity, her parents' identity, her husband's identity, or evidence that the Rapheal family was well-known in Liberia. Additionally, the IJ found that she did not provide any explanation for her lack of corroborative evidence. The IJ then denied Rapheal asylum, withholding of removal, and CAT relief because under the REAL ID Act she did not meet "her burden of proof through credible, consistent testimony or a combination of testimony and corroboration." IJ Decision at 27. The IJ ordered Rapheal removed to Germany, with an alternate order of removal to Liberia.

Rapheal appealed to the Board. The Board dismissed Rapheal's appeal, concluding that the IJ properly found that Rapheal failed to meet her burden of proof for asylum, withholding of removal, and CAT relief because "she did not provide corroborative evidence and could have done so . . . ." Board Decision at 2. The Board concluded that it need not reach the issue of Rapheal's credibility because Rapheal was not entitled to relief given her lack of corroborative evidence. Rapheal petitions this court for relief.

## II

Rapheal petitioned for asylum, withholding of removal, and CAT relief. In order to qualify for asylum, Rapheal

must show that she meets the statutory definition of "refugee." *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 671 (7th Cir. 2005). A refugee is defined as an individual who is unwilling to return to her native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Even if a petitioner qualifies as a refugee, asylum is still a discretionary decision. *Angoucheva v. INS*, 106 F.3d 781, 788 (7th Cir. 1997). Conversely, a petition for withholding of removal must be granted if "the alien's life or freedom would be threatened . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *Firmansjah v. Gonzales*, 424 F.3d 598, 604-05 (7th Cir. 2005). However, to establish entitlement to withholding of removal "the applicant must demonstrate a 'clear probability' that he or she will face persecution in the country to which he or she will be removed." *Id.* at 605. The "clear probability" standard requires an applicant to show that it is "more likely than not" that she will be subject to persecution if returned to her native country, a more stringent test than the standard for establishing eligibility for asylum. *Id.* The standard for CAT relief differs: "Relief under the CAT does not have to be on account of membership in a social group or political opinion to qualify for relief." *Pavlyk v. Gonzales*, 469 F.3d 1082, 1090 (7th Cir. 2006). However, to obtain relief under the CAT, Rapheal must establish that it is more likely than not that if removed she will be subject to torture. *Boyanivskyy v. Gonzales*, 450 F.3d 286, 292 n.3 (7th Cir. 2006).

On appeal, Rapheal does not distinguish between her claims for asylum, withholding of removal, or CAT relief

("petitions"). Rather, she asserts that the Board erred in denying all of her petitions based on her failure to provide corroborating evidence. In making this argument, Rapheal initially contends that our review is limited to the Board's rationale (and not the IJ's) because the Board issued its own free-standing opinion, as opposed to adopting or supplementing the opinion of the IJ. Rapheal is correct that "[w]hen the [Board] issues its own opinion rather than adopting or merely supplementing the opinion of the IJ, this court's task is to review only the opinion of the [Board]." *Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007). Conversely, "where the [Board's] decision merely supplements the opinion of the IJ, 'the IJ's opinion, as supplemented by the [Board's] opinion, becomes the basis for review.'" *Id.* (quoting *Liu v. Ashcroft*, 380 F.3d 307, 311 (7th Cir. 2004)). The government counters that the Board's decision was a single-member decision, issued pursuant to 8 C.F.R. § 1003.1(e)(5),[1] that affirmed in part

---

[1] Section 1003.1(e)(5) provides: "Other decisions on the merits by single Board member. If the Board member to whom an appeal is assigned determines, upon consideration of the merits, that the decision is not appropriate for affirmance without opinion, the Board member shall issue a brief order affirming, modifying, or remanding the decision under review, unless the Board member designates the case for decision by a three-member panel under paragraph (e)(6) of this section under the standards of the case management plan. A single Board member may reverse the decision under review if such reversal is plainly consistent with and required by intervening Board or judicial precedent, by an intervening Act of Congress, or by an intervening final regulation. A motion to reconsider or to reopen a decision that was rendered by a single Board member

(continued...)

and supplemented in part the IJ's decision, and thus we review the IJ's decision as supplemented by the Board. There is nothing in the text of the Board's decision to indicate whether it was issued pursuant to § 1003.1(e)(5) or was a three-member panel decision issued pursuant to §1003.1(e)(6). In the final analysis, though, as explained below, our decision would be the same whether we were reviewing the Board's decision only or the IJ's decision as supplemented by the Board. However, in the future the Board should exercise greater care in identifying whether its decision is intended to be a stand-alone decision or rather a supplement to the IJ's decision.

That brings us back to Rapheal's claim that the Board erred in requiring her to provide corroborative evidence. More specifically, Rapheal claims that the Board could not require her to provide corroborative evidence without making an explicit credibility finding. In support of her argument, Rapheal cites *Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004). In that case, this court established a three-part inquiry for reviewing a Board's denial of asylum based on the lack of corroboration. Specifically, this court held that if the Board denies asylum based on the lack of corroboration, the agency's explanation should include "(1) an explicit credibility finding; (2) an explanation of why it is reasonable to expect additional corroboration; and (3) an account of why the petitioner's explanation for not producing that corroboration is inadequate." *Id*. Rapheal argues that the Board's decision

---

[1] (...continued)
may be adjudicated by that Board member unless the case is reassigned to a three-member panel as provided under the standards of the case management plan."

must be reversed because it did not satisfy the mandate of *Gontcharova*.

Rapheal's reliance on *Gontcharova* is misplaced because Congress has since enacted the REAL ID Act of 2005, which amended the law regarding credibility and corroboration for asylum and withholding of removal cases. Our decision in *Gontcharova* came before passage of the REAL ID Act and interpreted a predecessor regulation, 8 C.F.R. § 208.13(a). *Gontcharova*, 384 F.3d at 876. That regulation provided that for purposes of establishing eligibility for asylum, "[t]he testimony of the applicant, if credible, may be sufficient to sustain [her] burden of proof without corroboration." 8 C.F.R. § 208.13(a). Prior to the REAL ID Act, the Board interpreted the phrase "may be sufficient" in § 208.13(a) "to mean that the applicant's testimony, though credible, will not *always* be sufficient." *Gontcharova*, 384 F.3d at 876 (emphasis in original). More specifically, in *Matter of S-M-J*, 21 I. & N. Dec. 722, 725 (BIA 1997), the Board adopted the corroboration rule that provides that under § 208.13(a), "where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to specifics of an applicant's claim, evidence should be provided . . . [or] an explanation should be given as to why such information was not presented." *Gontcharova*, 384 F.3d at 876 (quoting *Matter of S-M-J*, 21 I. & N. Dec. at 725).

We explained in *Gontcharova* that the Board's interpretation of § 208.13(a) is not the only one possible, and then explained the then-existent circuit split: The Second and Third Circuits endorsed the Board's interpretation of the regulation, while the Ninth Circuit interpreted the regulation as meaning that it "does not require corroborative evidence . . . from applicants for asylum and with-

holding of deportation who have testified credibly."
*Gontcharova*, 384 F.3d at 876 (quoting *Ladha v. INS*, 215 F.3d
889, 899 (9th Cir. 2000)). We then noted in *Gontcharova*
that "[w]e have expressed skepticism about the use of the
corroboration rule to discount otherwise credible testi-
mony." *Id.* at 877. However, rather than rejecting the
Board's corroboration rule out of hand, we held that "[i]n
order that we may review its application, . . . an IJ must
explain his use of it," and set forth the three-step inquiry
noted above. *Id.* at 877.

The REAL ID Act, however, codified the corroboration
rule, overriding any judicial skepticism of the Board's
interpretation of § 208.13(a) expressed in *Gontcharova.*
Specifically, the REAL ID Act provides that "[w]here the
trier of fact determines that the applicant should provide
evidence that corroborates otherwise credible testimony,
such evidence must be provided unless the applicant does
not have the evidence and cannot reasonably obtain the
evidence." 8 U.S.C. § 1158(b)(1)(B)(ii). The REAL ID Act,
thus, changed the framework for reviewing cases in which
the Board rejects a petition for asylum based on the lack of
corroborating evidence. *See Eke v. Mukasey*, 512 F.3d 372,
381 (7th Cir. 2008) (noting that "[t]he Real ID Act changed
the landscape for our review of this type of claim," namely
claims that the IJ erred in requiring corroborating evi-
dence). Under the REAL ID Act, if the fact-finder deter-
mines that an applicant should provide corroborating
evidence, corroborating evidence is required unless the
applicant cannot reasonably obtain that evidence. More-
over, under the REAL ID Act, corroborating evidence
may be required even if the applicant is credible. 8 U.S.C.
§ 1158(b)(1)(B)(ii). By codifying the corroboration rule,
Congress removed any doubt as to the validity of that
rule. Thus, the *Gontcharova* three-part test, established

for purposes of assessing the validity of the INS's de-
batable interpretation of the corroboration rule, no
longer controls.

Although *Gontcharova* no longer controls, given the
nature of the Board's ruling (along with the IJ's to the
extent we consider it), we conclude that, in this case, the
Board needed to consider Rapheal's credibility before
ruling on the need for corroborative evidence. That is
because in ruling that Rapheal needed to provide cor-
roborative evidence (given the conflicting documents in
the record), the Board treated Rapheal as if she were
not credible. The Board did this, though, without first
reviewing the IJ's credibility finding. Specifically, the
Board stated that although Rapheal's father's name is
Michael Rapheal, Rapheal had told the asylum officer
that her maiden name was "Kocoker." The Board added
that Rapheal's signature appeared on the immigration
form by a handwritten notation that her maiden name
was "Kocoker." Rapheal, however, testified before the IJ
that she had never heard of the word Kocoker and had
told the immigration officials that her maiden name was
Rapheal and had also told them that there were mis-
takes on the immigration form, which they had promised
to correct. Had the Board found Rapheal credible, that
would mean that the immigration officials had incor-
rectly noted Kocoker as Rapheal's maiden name, and
the disparity would not serve as a basis for requiring
corroborative evidence. Similarly, to the extent we con-
sider the IJ's decision, the IJ's holding that Rapheal must
provide corroborative evidence was directly tied to the IJ's
finding that she was not credible. Specifically, after thor-
oughly analyzing Rapheal's petitions, the IJ concluded:

> The respondent indicates that the only basis for her
> mistreatment is that (sic) her family's notoriety and

association with the former government of Charles Taylor. I have previously found that the respondent's evidence relating to a nexus between alleged harm and her family connection is not credible. The respondent's testimony on that issue was inconsistent and not corroborated. The respondent's *uncorroborated inconsistent testimony* fails to meet the burden that it is more likely than not that she would be tortured on that basis as well.

IJ Decision at 28 (emphasis added).

This passage, along with the reasoning the IJ employed throughout its opinion, makes clear that the IJ determined that corroborative evidence was required because Rapheal was not credible. This is not a case of the IJ ruling alternatively, i.e., holding that even if Rapheal were credible, her petition would be denied because of the lack of corroborative evidence. Similarly, in analyzing the need for corroborative evidence, the Board also noted the discrepancy between Rapheal's current testimony and the immigration forms—which Rapheal claims contained errors. While the REAL ID Act provides that the government may require corroborative evidence even if the petitioner is credible, it also provides that "[t]he testimony of the applicant may be sufficient without corroboration, but only if the applicant's testimony is credible, is persuasive and refers to specific facts." 8 U.S.C. § 1158(b)(1)(B)(ii). Thus, if the Board (or IJ) had found Rapheal's testimony credible, Rapheal might not have been required to provide corroboration. Yet on appeal, the Board bypassed the credibility finding, while presenting the conflicting facts as if she were not credible. The credibility finding was also inextricably intertwined with the IJ's ruling on the need for corroborative evidence. Accordingly, before relying on

disputed evidence about what Rapheal had said her maiden name was, the Board needed to determine whether Rapheal was credible.

Rapheal also claims that the Board erred in denying her petitions because it was unreasonable for the Board to expect her to present corroborative evidence of her father's relationship with Charles Taylor. The IJ also believed that Rapheal needed to provide evidence to corroborate her identity, given the conflicting evidence concerning Rapheal's name, maiden name, and husband's name. Rapheal maintains that there was no way for her to provide corroborative evidence in the form of newspaper articles or other documentary support to show her father's relationship with Taylor, given that she was fleeing for her life and did not have time to accumulate old newspaper articles. She adds that given the chaos in Liberia, such evidence is not available. Rapheal further claims that she could not obtain corroborating evidence while detained in the United States; however, if detention in the United States was sufficient for finding such evidence unavailable, corroborating evidence could rarely be required. Rapheal has the burden of proof in asylum cases, *see* 8 U.S.C. § 1158(b)(1)(B)(I), and thus must prove that corroborative evidence is not reasonably available. Yet in this case, Rapheal did not present any evidence to the IJ indicating that she attempted to obtain corroborative evidence, either personally or with the assistance of others. In fact, when the IJ asked whether any corroborating evidence existed, this exchange occurred:

Q: Now ma'am, you had testified that your father was well-known in Liberia. Is that correct?

A: Yes, sir.

Q: And ma'am, if he is so well-known in Liberia, why have you not been able to present anything to me, to show that he was well-known in Liberia?

A: Because I didn't leave home in peaceful home. I didn't left home with peace.

Q: Well, is there any information anywhere in the media regarding your family in Liberia?

A: I wouldn't know. I wouldn't know.

While Rapheal offered a plausible explanation for why she did not bring corroborating evidence with her when she fled, Rapheal's response that she "wouldn't know" whether there was any information anywhere in the media regarding her family indicated that she did not make any attempt to obtain corroborative evidence. Moreover, during the hearing before the IJ, Rapheal did not claim that she attempted to locate corroborative evidence, nor did she indicate that such evidence would be unavailable. Under these circumstances, and given that the burden of proof is on Rapheal, we cannot say that the IJ or the Board erred in holding that corroborating evidence was reasonably attainable. *See* 8 U.S.C. § 1252(b)(4) ("No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.").[2]

---

[2] It is reasonable to believe that Liberian libraries or the newspaper publishers themselves retain older newspapers, or universities in other parts of the world that study Liberia maintain a collection of Liberian newspapers or television

(continued...)

Rapheal responds that before ruling against her for failing to produce corroborative evidence, the IJ needed to warn her of the need for such evidence and that the IJ's failure to do so violated her due process rights. Initially we note that because on appeal Rapheal continues to maintain that it would be impossible to obtain any corroborative evidence, the IJ's failure to warn her could not prejudice her. In any event, Rapheal did not raise this issue before the Board. "Although petitioners generally do not have to exhaust due process claims administratively, they must raise such claims below when alleging procedural errors correctable by the BIA." *Sharashidze v. Gonzales*, 480 F.3d 566, 570 (7th Cir. 2007). Had Rapheal raised this issue before the Board it could have, if appropriate, remanded the case to the IJ. Therefore, we lack jurisdiction to review her claim. *See* 8 U.S.C. § 1252(d)(1) (noting that a court may review an agency's final order only if the alien has exhausted all administrative rem-

---

[2] (...continued)

broadcasts. Likewise, it is possible that Rapheal could obtain some evidence to corroborate her and her family's identity and other aspects of her testimony. In noting these possibilities, we are fully cognizant that documentation in disordered nations and Third World nations is not "as regular, multicopied, and ubiquitous . . . as in the United States." *Hor v. Gonzales*, 421 F.3d 497, 501 (7th Cir. 2005). However, Rapheal bears the burden of showing that corroborative evidence is not reasonably obtainable and she must do more than just say, in effect, I couldn't get any supporting evidence. Moreover, as noted below, *see infra* at 22-23, corroborative evidence is the only hope for Rapheal if the IJ finds that she is not credible and, thus, there is a need for Rapheal to explore every possible avenue for corroborative evidence.

edies as of right). Finally, we add that the REAL ID Act clearly states that corroborative evidence may be required, placing immigrants on notice of the consequences for failing to provide corroborative evidence. *See* 8 U.S.C. § 1158(b)(1)(B)(ii) ("Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence."). To hold that a petitioner must receive additional notice from the IJ and then an additional opportunity to provide corroborative evidence before an adverse ruling, would necessitate two hearings—the first to decide whether such corroborating evidence is required and then another hearing after a recess to allow the alien more time to collect such evidence. This would add to the already overburdened resources of the DHS, and such an approach would seem imprudent where the law clearly notifies aliens of the importance of corroborative evidence.

Normally, at this point we would remand the case to the Board to rule on Rapheal's credibility, and then based on the Board's credibility holding, to rule anew on the need for corroborative evidence. However, in this case, Rapheal also argues that the hearing before the IJ violated her due process and statutory rights. Specifically, Rapheal argues that the IJ violated her due process and statutory rights by holding the hearing on her petitions via video conference, as opposed to in person. Accordingly, we must now determine whether Rapheal is entitled to a new hearing before the IJ.

In arguing that her due process rights were violated, Rapheal first argues, in effect, that 8 C.F.R. § 1003.25(c) is facially unconstitutional. *See* Appellant Brief at 30 ("[T]he

use of video conferencing in removal proceedings denies
aliens seeking asylum a meaningful opportunity to effec-
tively present their case. Accordingly, this court should
declare that 8 C.F.R. § 1003.25(c) is unconstitutional
because it infringes upon aliens' right to due process.")
Section 1003.25(c) provides:

> Telephonic or video hearings. An Immigration Judge
> may conduct hearings through video conference to the
> same extent as he or she may conduct hearings in
> person. An Immigration Judge may also conduct a
> hearing through a telephone conference, but an evid-
> entiary hearing on the merits may only be conducted
> through a telephone conference with the consent of
> the alien involved after the alien has been advised of
> the right to proceed in person or, where available,
> through a video conference, except that credible fear
> determinations may be reviewed by the Immigration
> Judge through a telephone conference without the
> consent of the alien.

8 C.F.R. § 1003.25(c).

Congress specifically authorized proceedings by means
of a video conference. *See* 8 U.S.C. § 1229a(b)(2)(A)(iii). "In
cases claiming due process violations in immigration
proceedings, we recently have reminded petitioners that
proceedings which meet the statutory and regulatory
standards governing the conduct of removal hearings, as a
general rule, comport with due process." *Alimi v. Gonzales*,
489 F.3d 829, 834 (7th Cir. 2007). Only where Congress has
"adopted some specific rule that is open to constitutional
doubt" would it "be necessary (and appropriate) to con-
sider constitutional claims." *Rehman v. Gonzales*, 441 F.3d
506, 508 (7th Cir. 2006). Rapheal has not shown any
doubt about the constitutionality of hearings via video

conference. No court has ever held that Congress has violated the due process clause by authorizing removal hearings to proceed via video conference. *See Eke*, 512 F.3d at 382. In fact, the Fourth Circuit found that a video conference hearing satisfied the due process requirement set forth in *Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976), and provided the petitioner with an "opportunity to be heard at a meaningful time and in a meaningful manner," even though the three-hour hearing "was plagued by communication problems." *See Rusu v. INS*, 296 F.3d 316, 319, 324 (4th Cir. 2002).[3] In short, Rapheal's facial challenge to the constitutionality of video conferencing fails because Congress authorized such proceedings and those proceeding provide an adequate opportunity to be heard in a meaningful manner and at a meaningful time. *See Mathews*, 424 U.S. at 333-34.

Rapheal also challenges the use of video conferencing in her case (i.e., an as-applied challenge), claiming that the video conference proceedings prevented her from having an opportunity to be heard in a meaningful manner. Rapheal's as-applied argument does not challenge the validity of the statutes and procedures that governed her removal proceeding. "We have remarked before on the tendency of flabby constitutional arguments to displace more focused contentions. . . . Aliens should stick with claims based on the statutes and regulations unless they believe that one of these rules violates the Constitution or that lacunae in the rules have been filled with defective procedures." *Rehman*, 441 F.3d at 508-9. Because

---

[3] This court in *Eke* also rejected a due process challenge to video conferencing, albeit by concluding that there was no prejudice. *Eke*, 512 F.3d at 383.

Rapheal's as-applied challenge (as opposed to her facial challenge) is not based on a claim that the rules themselves violate the Constitution, the appropriate focus is not on constitutional principles, but on the statutory procedures established for removal procedures, *see Rehman*, 441 F.3d at 509, which Rapheal also challenges.

First, Rapheal argues that the use of video conferencing violated her statutory right to legal representation. Section 1229a(b)(4)(A) defines the statutory right at issue, providing: "In proceedings under this section, under regulations of the Attorney General-(A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings." 8 U.S.C. § 1229a(b)(4)(A). Rapheal claims the use of video conferencing interfered with her ability to consult with her attorney because her attorney was forced to either be with her at the distant site, or be in the courtroom where she would have superior access to evidence and the ability to confer with the court and opposing counsel. Rapheal also claims that the video conference arrangement prevented her from conferring confidentially with her attorney.

Although attorneys might not like having to choose between sitting beside their clients or before the IJ, under either scenario the alien receives the benefit of legal representation. Moreover, there is nothing in the record in this case to indicate that the video conferencing interfered with Rapheal's attorney's representation. To the contrary, the transcript of the hearing demonstrates that Rapheal was ably represented. Rapheal counters that the video conferencing prevented her from consulting confidentially with her attorney. However, neither Rapheal

nor her attorney at any time during the hearing requested to talk in private. Therefore, Rapheal cannot now complain that she was prevented from conferring confidentially with her attorney. Accordingly, under the circumstances of this case we conclude that Rapheal's statutory right to legal representation was not violated.

Rapheal also argues that the video conference prevented the government from contemporaneously transferring documents between the detention facility and the courtroom and left her without an opportunity to review the evidence against her. Again, although Rapheal presents this as both a constitutional and statutory challenge, as we have said, "[t]here is no need to invoke the Constitution when the immigration statute itself guarantees a fair hearing." *Kadia v. Gonzales*, 501 F.3d 817, 824 (7th Cir. 2007). In this case, the statutory right is found in 8 U.S.C. § 1229a(b)(4)(B), which provides that "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government."

Whether a video conference allows aliens a reasonable opportunity to examine the evidence against them will depend on the circumstances. In most cases, documents can be properly examined from afar by the alien. Or those documents might not be material to the case or the IJ's decision.[4] In this case, however, the Record of Sworn Statement ("Immigration Report") was material to Rapheal's case, and the IJ relied on it in finding Rapheal

---

[4] Of course, the government could always arrange to have a second set of documents available at the distance-site for review by the alien.

not credible. The Immigration Report was a summary prepared by immigration officials of what Rapheal told them during their questioning of her, and the Immigration Report contained a handwritten notation listing Rapheal's maiden name as Kocoker. Although Rapheal testified that she never heard the name Kocoker, the IJ found that Rapheal was not credible because the Immigration Report indicated that she had earlier told immigration officers that her maiden name was Kocoker. Thus, the Immigration Report proved highly relevant to Rapheal's case and the IJ's decision. Rapheal claims that given the weight the IJ placed on this handwritten notation, she should at least have had the opportunity to review the document, but was unable to do so because of her remote location. While the transcript in this case reflects references made to the Immigration Report, nowhere does it indicate that Rapheal was actually able to see the document. Moreover, the record contains only a written transcript of the proceedings, so we have no video recording to determine whether Rapheal was shown the Immigration Report, and if so, whether she was able to adequately view the document. Under these circumstances, we must conclude that the IJ denied Rapheal her rights under 8 U.S.C. § 1229a(b)(4)(B) to a reasonable opportunity to examine evidence used against her.[5]

---

[5] Rapheal also claims that the government violated her statutory right to a "reasonable opportunity to present evidence on [her] own behalf." 8 U.S.C. § 1229a(b)(4)(B). At the video conference hearing, Rapheal presented testimony from a doctor who treated her and she testified on her own behalf. While there were some sections of the proceedings where Rapheal's testimony was incomprehensible, it appears the

(continued...)

The government argues that Rapheal's due process claims (reframed above in their proper statutory form) fail because she cannot prove prejudice. To succeed on a claim that she did not receive a fair hearing, Rapheal must demonstrate prejudice. *Hussain v. Keisler*, 505 F.3d 779, 781 (7th Cir. 2007). We have explained that prejudice means that the lack of a fair hearing "actually had the potential for affecting the outcome" of the proceedings. *See Kuciemba v. INS*, 92 F.3d 496, 501 (7th Cir. 1996) (internal citation omitted).

In this case, although Rapheal's attorney did not object to the admission of the document, during the hearing Rapheal testified that there were mistakes on the form and that she had told the immigration officers of those mistakes and that they had promised to correct them. Yet at the hearing, Rapheal did not have an opportunity to review the Immigration Report or the handwritten notation listing her maiden name as "Kocoker" or what purported to be her signature next to the notation. Rapheal's review of the Immigration Report and her testimony after reviewing the Immigration Report has the potential for affecting the IJ's view of her credibility and in turn the outcome of this case.[6] Accordingly, Rapheal is entitled to

---

[5] (...continued)
difficulty flowed from the speed of Rapheal's testimony (as the IJ and her attorney had to request several times that she slow down), rather than the video conference technology. In any event, we have reviewed the entire transcript and conclude that the video conference did not interfere with Rapheal's ability to present evidence on her own behalf.

[6] The Immigration Report included Rapheal's signature on page two next to the handwritten notation stating her maiden
(continued...)

a new hearing. Of course, at the new hearing, the IJ might nonetheless find Rapheal not credible, but that will only be after Rapheal has received the statutory rights guaranteed her by Congress.

In closing, we note that because the government denied Rapheal a hearing that conformed to her statutory rights, she is entitled to a new hearing and at that new hearing there is no reason that Rapheal cannot provide any corroborating evidence she has been able to obtain. While, on appeal, her attorney claimed there was no way to obtain corroborating evidence, we have posited some possible avenues of inquiry. If none pans out, then Rapheal could at least testify about her efforts to obtain corroborating evidence. Alternatively, on remand after a new hearing, the IJ may find Rapheal credible and that there is no need for corroborative evidence or that corroborative evidence is unavailable based on additional evidence of Rapheal's attempts to locate such evidence. However, if the IJ again finds that Rapheal is not credible, without corroborative evidence she will be unable to succeed on her claims for relief. *See* 8 U.S.C. § 1158(b)(1)(B)(ii) ("The testimony of the applicant may be sufficient to sustain the

---

6  (...continued)

name as "Kocoker." Rapheal's signature also appeared at the end of the Immigration Report, where she verified that her answers are "true and correct" and that the "statement is a full, true and correct record of my interrogation." The Immigration Report then states that Rapheal initialed each page of the statement and the corrections noted on pages six and seven. However, as noted above, Rapheal also initialed page two of the statement next to the addition of "Kocoker" as her maiden name.

applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee."). Finally, we note that although video conferencing is available and satisfies constitutional and statutory standards, in this case the government's decision to hold a video conference seems strange because the government had to transport Rapheal a greater distance to participate in the video conferencing than the distance it would have had to bring her to attend the hearing live before the IJ. On remand, we encourage the IJ to consider anew Rapheal's request for an in-person hearing, given the logistics involved in this case.[7]

### III.

Congress authorized the use of video conferencing for immigration hearings and, facially, this authorization comports with the requirements of due process. While Rapheal also presents an as-applied due process challenge, those claims are properly considered as challenges to the claimed denials of her statutory rights. The use of video conferencing, even though it separates attorneys from their clients, does not violate the statutory right to representation and, in this case, did not deny Rapheal her right to representation. The hearing also provided

---

[7] On appeal, Rapheal also argues that the IJ abused its discretion in denying her an in-person hearing. We need not reach this issue, however, because we are remanding the case for a new hearing and on remand the IJ may exercise its discretion differently.

Rapheal with a reasonable opportunity to present evidence on her own behalf. However, from the record in this case, we conclude that Rapheal did not have a chance to review the Immigration Report admitted against her. Given the significance the IJ placed on the handwritten notation of "Kocoker" in the Immigration Report, remand is required to allow Rapheal to review that document and to testify following her review of the document. On remand, because Rapheal is entitled to a new hearing that comports with statutory requirements, Rapheal is free to present any corroborative evidence she has obtained. The IJ is also free to judge her credibility and the need for corroborative evidence, as consistent with the evidence presented at the new hearing. We GRANT the petition for review and REMAND for proceedings consistent with this opinion.