In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 20-1078

CESAR MARTINEZ-BAEZ,

*Petitioner,*

*v.*

MONTY WILKINSON,
Acting Attorney General of the United States,

*Respondent.*

---

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A200-778-427

---

ARGUED SEPTEMBER 15, 2020 — DECIDED FEBRUARY 1, 2021

---

Before FLAUM, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Cesar Martinez-Baez has been fighting to remain in the United States ever since April 5, 2011, when he first received notice of removal proceedings from the immigration authorities. Martinez-Baez concedes that he is removable, but he maintains that he is entitled to be

considered for discretionary cancellation of removal under
section 240A of the Immigration and Nationality Act (INA),
8 U.S.C. § 1229b(b). The immigration judge did not see mat-
ters that way, finding instead that Martinez-Baez had not es-
tablished either of the legal prerequisites for cancellation:
10 years of continuous presence or exceptional and extremely
unusual hardship to a U.S. citizen relative. The Board of Im-
migration Appeals affirmed, and Martinez-Baez has now pe-
titioned this court for review.

We conclude that the Board was too quick to deny relief.
The IJ erred procedurally by failing to resolve whether
Martinez-Baez's testimony about the most important fact in
this case—his date of entry—was credible. In addition, the IJ
and Board mischaracterized the evidence pertaining to the
asserted hardship. We therefore grant the petition and
remand for further proceedings.

**I**

Martinez-Baez was born in Veracruz, Mexico, in 1980. As
he tells it, in the summer of 2000 he unlawfully crossed the
U.S.-Mexico border. The exact date of his initial entry is un-
clear. The government agrees, however, that border patrol
agents apprehended Martinez-Baez and returned him to
Mexico three times in June of 2000. Martinez-Baez testified
that after his third return, he again slipped back into the coun-
try and at last succeeded in remaining undetected. If that is
true, then the starting point for his stay in the United States is
around late June or July of 2000.

After crossing the border, Martinez-Baez headed north to
Lake Geneva, Wisconsin, which is located about an hour
north-northwest of Chicago. There he purchased a social

security and work permit card for $60 under the assumed name of Waldemar Oquendo. He soon began working at a plastics factory, where he remained for more than seven years. The first time he filed a federal tax return was in 2002.

Martinez-Baez settled in Lake Geneva and eventually had three U.S.-citizen children with his partner. His youngest daughter, Melanie, was born in January of 2012. Since starting kindergarten, Melanie has experienced speech and language impairments that make it difficult for her to communicate and to understand directions. As it was required to do, the Lake Geneva School system created an Individualized Education Program ("IEP") for Melanie. See Wisc. Stat. §§ 115.76(9), 115.787; Wisc. Admin. Code PI 11.36(5)(a).

Eight months before Melanie was born, the Department of Homeland Security served Martinez-Baez with a Notice to Appear. The NTA, dated April 5, 2011, charged that he was removable under 8 U.S.C. § 1227(a)(6)(A)(i) for being present in the United States without admission or inspection. Martinez-Baez appeared before an IJ on June 26, 2012, and conceded removability, but he indicated that he would seek cancellation of removal—a discretionary form of relief pursuant to 8 U.S.C. § 1229b.

In order to obtain cancellation of removal, a noncitizen must demonstrate that he satisfies the applicable eligibility requirements and that he merits a favorable exercise of discretion. § 1229a(c)(4)(A); see *Perez-Fuentes v. Lynch*, 842 F.3d 506, 508 (7th Cir. 2016). There are four threshold eligibility requirements. Cancellation is possible, though not guaranteed, if the noncitizen:

(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [his] application;

(B) has been a person of good moral character during such period;

(C) has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title, subject to paragraph (5); and

(D) establishes that removal would result in exceptional and extremely unusual hardship to the [noncitizen's] spouse, parent, or child, who is a citizen of the United States or [a noncitizen] lawfully admitted for permanent residence.

§ 1229b(b)(1). On May 25, 2018, the IJ denied relief, holding that Martinez-Baez had failed to establish continuous presence (subpart A) and hardship (subpart D).

Although Martinez-Baez initially testified that he entered in May or June of 2000, the IJ noted in his eventual decision that "on cross-examination [Martinez-Baez] admitted that it may have been July, 2000." The judge then remarked: "However, there is no corroborative documentation for either 2000 or 2001." He further noted that "[t]he respondent testified that his documents under the name 'Waldmaro [*sic*] Oquendo' were lost," and that "although [Martinez-Baez] stated that he immediately obtained a job with a plastics factory (and maintained employment over the course of the next seven years), he did not submit a letter to confirm this despite the fact that his partner and the mother of their children … is employed there now." Last, the IJ noted that in Martinez-Baez's

application for relief, he wrote that he started working for the plastics factory in July 2002.

The IJ also held that Martinez-Baez had not shown that Melanie would suffer exceptional and extremely unusual hardship if he were removed. Martinez-Baez had submitted Melanie's IEP to the IJ, and at the hearing, the IJ heard testimony from Martinez-Baez and Tracy Mitten (a speech pathologist at Lake Geneva Public schools who helped to craft Melanie's IEP and worked directly with Melanie). The IJ nonetheless found the record incomplete and complained that he had to assess the IEP "without sufficient guidance" to determine how much hardship Melanie was likely to suffer without her father. The IJ believed that

> the testimonies of the witnesses (including the respondent) did not adequately address, and therefore did not adequately establish, the severity of her condition, the impact (both short-term and long term) of the respondent's departure (with or without her), the availability of similar treatment in Mexico if she were to accompany him, why treatment would necessarily have to be discontinued if he were to return to Mexico alone, and her future prognosis.

The IJ thus denied relief. On appeal, the Board of Immigration Appeals "adopted and affirmed" the portion of the IJ's decision pertaining to the hardship criterion. Holding that a lack of hardship to Melanie sufficed to deny relief, the Board dismissed the appeal; it declined to reach the continuous-presence issue.

On January 14, 2020, Martinez-Baez asked us to review his case. He maintained that the IJ's decision was arbitrary and

capricious because the judge "failed to consider relevant tes-
timony of the Petitioner and the witness." The Acting Attor-
ney General maintains that the IJ considered those testimo-
nies at length, and that apart from the merits of Martinez-
Baez's claims, 8 U.S.C. § 1252(a)(2)(B)(i) strips this court of ju-
risdiction even to entertain this petition.

## II

The government correctly notes that the courts generally
lack jurisdiction to review denials of discretionary relief. Sec-
tion 1252(a)(2)(B)(i) of the statute provides that "no court shall
have jurisdiction to review," among other things, any judg-
ment regarding the granting of relief under section 1229b
(cancellation of removal). But there are exceptions. Section
1252(a)(2)(D) limits the jurisdiction-stripping language of sec-
tion 1252(a)(2)(B) by providing that nothing in that section
"shall be construed as precluding review of constitutional
claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). We have
interpreted the phrase "questions of law" in subparagraph
(D) narrowly, holding that legal questions are present only
when the "Board misinterprets a statute, regulation, constitu-
tional provision, or its own precedent, applies the wrong legal
standard, or fails to exercise its discretion at all." *Bachynskyy
v. Holder*, 668 F.3d 412, 417 (7th Cir. 2011).

On this understanding, we often have declined to exercise
jurisdiction over removal cases in which the petitioner
wanted us to review whether a legal standard was correctly
applied to the facts of her case. *Musa v. Lynch*, 813 F.3d 1019,
1023 (7th Cir. 2016). We reasoned that the mere presence of a
"legal standard" on which the IJ or Board based its decision
could not give rise to a justiciable "legal question" under sec-
tion 1252(a)(2)(D). Our restraint has been founded on a belief

that if we were to proceed otherwise, "nearly all factual determinations would fall within our jurisdiction despite Congress' mandate to the contrary." *Adebowale v. Mukasey*, 546 F.3d 893, 896 (7th Cir. 2008). To avoid that result—one that we have deemed inconsistent with the statutory scheme—we have taken the position that a "question of law" does not arise when the issue relates to the application of a legal standard to the facts of the case—*i.e.* a mixed question of law and fact.

It is possible that we have drawn too strict a line. Recently the Supreme Court read the jurisdictional grant more generously. See *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062 (2020). The issue before the Court in that case concerned the Board's denial of the petitioner's request for equitable tolling—a decision that required the Board to determine, in its discretion, whether an applicant had exercised "diligence" in pursuing his claim. The Fifth Circuit had found that it was barred from reviewing the Board's action because the question whether an alien was diligent for purposes of equitable tolling was a factual one, outside the scope of section 1252(a)(2)(D).

The Supreme Court did not see the case that way. It described the question before it as follows: "whether the statutory phrase 'questions of law' includes the application of a legal standard to undisputed or established facts." 140 S. Ct. at 1068. The answer, it held, is yes. In the case before it, the petitioners had been found to be removable based on certain crimes they had committed. Section 1252(a)(2)(C) describes the outer bounds of judicial review for such "orders against criminal aliens," and contains a jurisdiction-stripping provision functionally identical to the one found in section 1252(a)(2)(B)(i), the part of the statute that limits judicial review of denials of discretionary relief. As is the case with

section 1252(a)(2)(B), subparagraph (C)'s jurisdictional restriction is limited by subparagraph (D). We see nothing in the language or logic of *Guerrero-Lasprilla* that would indicate that its holding is limited to subparagraph (C). It thus may be the case that, to the extent that Martinez-Baez raises either pure legal questions or "the application of a legal standard to undisputed or established facts," he may take advantage of section 242(a)(2)(D).

This case does not require us ultimately to take a position on that issue. But it is a serious question. On the one hand, both the Department of Justice and several of our sister circuits have read *Guerrero-Lasprilla* not to go that far. The Acting Attorney General argues that *Guerrero-Lasprilla*'s "silence" (his word, not ours) on whether subparagraph (D) "permits review of agency exercises of discretion" must mean that *Guerrero-Lasprilla* did not authorize subparagraph (D) to cover the discretionary decisions enumerated in subparagraph (B). Persuaded by that reasoning, the Tenth Circuit has held that *Guerrero-Lasprilla* notwithstanding, subparagraph (D) does not authorize courts to review "how the Board exercises its discretion," even if that entails how the Board applies an acknowledged legal standard to a discretionary decision. *Galeano-Romero v. Barr*, 968 F.3d 1176, 1183–84 (10th Cir. 2020). And the Fifth Circuit recently held that *Guerrero-Lasprilla* did not displace its jurisdiction-limiting precedent, because its restraint is "not based on whether [a discretionary decision] is too 'factual' to be a 'question[ ] of law,'" but is instead based "on the simple observation that the Attorney General's power [to make that decision] is purely discretionary." *Nastase v. Barr*, 964 F.3d 313, 320 (5th Cir. 2020).

On the other hand, our sister circuits may have skipped too quickly over the text of the statute, as now construed in *Guerrero-Lasprilla*. Although "a subchapter heading cannot substitute for the operative text of the statute," *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008), the Supreme Court has recognized that "statutory titles and sections headings are tools available for the resolution of a doubt about the meaning of a statute." *Id.* (citations and quotation marks omitted). With that in mind, we observe that the heading of section 1252(a)(2)(B) provides that "Matters not subject to judicial review" include "Denials of discretionary relief." Section 1252(a)(2)(B) then says that "no court shall have jurisdiction to review" the discretionary decisions enumerated within that section "*except* as provided in subparagraph (D)." (Emphasis added). Turning to subparagraph (D), we are told that "nothing in subparagraph (B) or (C) … shall be construed as precluding review" of constitutional claims or legal questions. *Guerrero-Lasprilla* may thus indicate that courts have a role to play if, antecedent to or embedded in a discretionary call, there is a constitutional claim or a question of law.

Such an interpretation would not wreak havoc with the statutory review scheme. Many discretionary decisions will be unaffected by a nonfrivolous question of law, and thus they will continue to be unreviewable pursuant to the general rule of subparagraph (B) or (C). Discretion normally has some boundaries, however, and courts are authorized under subparagraph (D) to ensure that those statutory limits are respected. The *Guerrero-Lasprilla* Court was concerned about the risk of unduly constricting the scope of section 1252(a)(2)(D), which it dubbed the Limited Review Provision. 140 S. Ct. at 1067. The Court ruled as it did in order to preserve the respective roles of sections 1252(a)(2)(D) and the two subparagraphs

that it affects. To hold that review is never possible so long as
the Board accurately recites the letter of the law, the Court
warned, would permit the Board perpetually to evade review
of a great number of legal issues. 140 S. Ct. at 1070.

As we said, however, we do not need to wrestle these dif-
ficult questions to the ground. Pertinent to Martinez-Baez's
case, we know that even if the final decision whether to cancel
removal is discretionary, legal questions can and do arise
along the way. We thus proceed to look at the issues before us
in accordance with our established cases.

## III

The Board adopted and affirmed the decision of the IJ on
the "presence" issue without supplementing the IJ's
reasoning. Thus, the relevant "final agency determination"
for our review is the IJ's decision. See *Hussain v. Gonzales*, 424
F.3d 622, 626 (7th Cir. 2005). Martinez-Baez's appeal presents
procedural questions, which are legal in nature. The first is
whether an IJ commits error when he fails to make an express
credibility finding, and then holds that gap in the record
against the applicant. Such an error would go to the
procedural sufficiency of the hearing, which is a legal point.
See *Perez-Fuentes v. Lynch*, 842 F.3d 506, 510 (7th Cir. 2016).
The second question relates to the hardship issue and the IJ's
and Board's application of the standard for such evidence to
the facts before them.

### A. Continuous Presence

The first requirement for cancellation of removal under
section 1229b(b)(1) requires that the applicant establish con-
tinuous physical presence for at least the 10 years immedi-
ately preceding his receipt of a Notice to Appear. *Duron-Ortiz*

*v. Holder*, 698 F.3d 523, 527 (7th Cir. 2012). The burden is on the applicant to establish continuous presence. § 1229a(c)(4)(B). The IJ has the authority to order that the "applicant should provide evidence which corroborates otherwise credible testimony," and the applicant "must" comply "unless [he] demonstrates that [he] does not have the evidence and cannot reasonably obtain the evidence." *Id*.

1

The only evidence that Martinez-Baez produced to establish continuous presence was his own testimony at the May 7, 2018 removal hearing. Prompted by his attorney, he initially stated that he had "entered in June of 2000" and began working at a plastics factory soon after. On cross examination, the government's attorney asked Martinez-Baez whether he had any documents to show he was in the United State before 2002, because the earliest documentary evidence on record was a 2002 tax return. Martinez-Baez replied, "Well, yes. I had some documents. I don't really know what happened. I had them under the other name, name of Waldemar Oquendo, but I think they were lost. I, I lost them, but I, I also had an account, a bank account, and also, they should have records at the factory that I worked in."

Right after this exchange, the government's attorney sought to impeach Martinez-Baez's account of his date of entry by asking whether he recalled being returned to Mexico by border patrol agents in the summer of 2000. Martinez-Baez said yes. The government's attorney then asked whether he could recall in which month those returns took place:

A: Not exactly, but since I remember I got here in June, possibly in May it would have been.

Q: So, would it surprise you to know that all three of those returns were in July 2000?

A: Well, I don't remember exactly. I really don't remember exactly whether it's June or July, but they were one after the other. So, after that, I didn't go and do it again.

Q: Okay. And then right after that, is that when you came into the United States?

A: Just right after that, yes.

Q: Okay. So is it fair to say you did not enter the United States in June of 2000?

A: Well, the truth is I don't remember exactly, so it's difficult for me to say yes or no. What I do remember is that I came in either in June or July.

The IJ ultimately held that Martinez-Baez failed to carry his burden of establishing continuous presence. In his opinion, the IJ criticized what he saw as Martinez-Baez backtracking on cross-examination about his precise date of entry and the lack of "corroborative evidence for either 2000 or 2001." This latter point seemed especially to trouble him. He also remarked that Martinez-Baez had not managed to produce a letter to confirm his alleged employment in the plastics factory, "despite the fact that his partner and the mother of their children … is employed there now." He also noted the lack of any corroboration that Martinez-Baez had a bank account in 2000.

2

The INA grants the IJ discretion to ask for corroborative evidence to support an applicant's petition for relief. If asked,

the applicant must either produce such evidence or explain why he cannot do so. If he does neither, the IJ is authorized to deny relief. See § 1229a(c)(4)(B); *Weiping Chen v. Holder*, 744 F.3d 527, 533 (7th Cir. 2014) ("Unless [the applicant] can prove that he could not have reasonably obtained corroborating evidence, his failure to produce such evidence is 'fatal to [his] claims.'"). There is no need for an IJ to warn the applicant of the consequences of failing to furnish the corroborative evidence before making an adverse ruling. See *Rapheal v. Mukasey*, 533 F.3d 521, 530 (7th Cir. 2008).

Nonetheless, when a credibility finding is "inextricably intertwined with the IJ's ruling on the need for corroborative evidence," *Id*. at 528, the Board must consider the applicant's "credibility before ruling on the need for corroborative evidence." *Id*. Logically, this implies that when an IJ says nothing about credibility, yet later based his decision on the applicant's failure to produce evidence supporting otherwise undisputed testimony, he commits procedural error.

3

The INA expressly imposes on the IJ the duty to make and explain his credibility finding in removal proceedings:

> In evaluating the testimony of the applicant or other witness in support of the application, the immigration judge *will* determine whether or not the testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant has satisfied the applicant's burden of proof. In determining whether the applicant has met such burden, the immigration

judge *shall* weigh the credible testimony along with other evidence of record.

8 USC § 1229a(c)(4)(B) (emphasis added). As used here, the word "will" reflects a mandate. See Garner's Dictionary of Legal Usage 947 (3d ed. 2011) (Will: "must"). (The other possibility is as an indicator of the future tense, but no one would read the language quoted above that way.) And this determination must take place during the process of evaluating the testimony.

The second sentence in the excerpt tells the IJ that he "*shall*" weigh the "credible testimony along with other evidence of record" when determining whether the applicant has met his burden of proof. § 1229a(c)(4)(B). The word "shall" typically connotes a command, not a discretionary option, and that is how the INA consistently uses it. For example, it states that the "immigration judge *shall* administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1) (emphasis added). In order to carry out his duty under section 1229a(c)(4)(B), the IJ must know which evidence falls on the "credible" side of the line, and which does not. And for our purposes, meaningful review is possible only if we know how the IJ assessed the evidence—indeed, we are barred from making an independent determination on that factual issue. See *Boadi v. Holder*, 706 F.3d 854, 860 (7th Cir. 2013).

Section 1229a(c)(4)(C) concludes by establishing what happens if for some reason the IJ fails to make an express credibility finding: "There is no presumption of credibility[;] however, if no adverse credibility determination is explicitly made, the applicant or witness *shall* have a rebuttable presumption of credibility on appeal." (Emphasis added.) In

other words, at the outset there is no presumption in favor of the applicant's credibility, but if the IJ makes no express finding on the point, then a rebuttable presumption of credibility arises.

4

In Martinez-Baez's case, the IJ failed to make this critical finding. Instead, in his brief discussion of the continuous-presence requirement, the judge noted only that "the respondent has not presented *sufficient* probative evidence" and that he has not furnished "corroborative documentation for either 2000 or 2001." (Emphasis added). (Recall that any arrival time before April 5, 2001, would have sufficed to satisfy the ten-year rule.) In addition, the judge specifically stated that Martinez-Baez was *not* barred from relief because of his moral character. See 8 U.S.C. § 1101(f). What we do not know is whether this was a back-handed way of saying that Martinez-Baez's testimony was not credible, or if the IJ thought the testimony was credible (perhaps noting that the evidence of his unsuccessful efforts in 2000 to cross the border provided some corroboration for a 2000 arrival). If we could read it as a credibility finding, then we would defer to the IJ's finding. But we cannot squeeze a credibility finding out of this record. That leaves us with a missing step: an express assessment of credibility. This is not a procedural gap that we are authorized to fill.

Martinez-Baez's case is similar to *Rapheal v. Mukasey*, *supra*, 533 F.3d 521. There, based on an inconsistency between the content of the applicant's testimony and an earlier written representation to the court, an IJ found that the testimony was not credible. 533 F.3d at 524–25. The critical question was whether the applicant's family name, Rapheal, would make

her vulnerable to persecution if she were returned to Liberia, her country of origin. *Id*. She testified that her father, Michael Rapheal, was well known as a supporter of the notorious Charles Taylor regime, but there was a handwritten note indicating that her maiden name was "Kocoker," which was not a family associated with Taylor. The IJ denied relief, holding that she did not meet "her burden of proof through credible, consistent testimony or a combination of testimony and corroboration." *Id*.

On appeal, the Board declined to reach the issue of Rapheal's credibility, holding that it was sufficient for dismissal that she "did not provide corroborative evidence and could have done so." *Id*. § 1158(b)(1)(B)(ii). We granted her petition for review and remanded. We reasoned that in cases such as Rapheal's—where the statute permits relief solely on the basis of credible testimony and an IJ determines that corroborative evidence is required because the applicant's testimony is not credible—the Board is required independently to assess credibility. *Id*. at 528. When the Board "bypasse[s] the credibility finding," the reviewing court is unable to ascertain whether relief may have been granted had a positive finding of credibility been made. *Id*.

The same principle holds at the IJ level (and recall, the Board essentially adopted the IJ's decision on this point). If the IJ bypasses the credibility finding and demands corroborative evidence, we need to know whether the judge is doing so in order to buttress otherwise credible testimony or to overcome testimony that is not credible.

"This is not a case of the IJ ruling alternatively, *i.e.*, holding that even if [the applicant] were credible, her petition would be denied because of the lack of corroborative evidence." *Id*.

at 528. All we know here is that the IJ faulted Martinez-Baez for not producing corroborative documentation. But we cannot confidently forecast how the IJ might have weighed the evidence of continuous presence in the final analysis, had he made a positive credibility finding about Martinez-Baez's testimony. The IJ's failure to make a credibility finding is thus a procedural legal error.

The statute requires the IJ to make an express credibility finding, both to ensure that the evidence is properly assessed, and to facilitate meaningful review by both the Board and the court. Because the IJ did not do so here, we cannot rely on this ground for his decision. Perhaps the Board had a similar concern, as it chose to rest its decision exclusively on the hardship ground. We thus move on to that issue, recalling again that Martinez-Baez may not prevail unless he can demonstrate reviewable error on both points.

## B. Extreme Hardship

As we noted earlier, section 1229b(b)(1)(D) requires an alien to "establish[] that removal would result in exceptional and extremely unusual hardship to the [noncitizen's] spouse, parent, or child, who is a citizen of the United States … ." For this part of the case, we review the decision of the Board, which found that "the respondent has not submitted sufficient evidence to establish that the hardship to his U.S. citizen would rise to the level of exceptional and extremely unusual [*sic*] upon his removal to Mexico." The requisite hardship for this purpose must be "substantially different from, or beyond, that which would be normally expected from the deportation of an alien with close family members in the United States." *Cruz–Moyaho v. Holder*, 703 F.3d 991, 995 (7th Cir. 2012) (quoting *In re Monreal-Aguinaga*, 23 I. & N. Dec. 56, 65 (BIA 2001))

(alterations omitted). Notably, the Board has recognized that a "strong applicant [for relief] might have a qualifying child with very serious health issues, or compelling special needs in school." *In Re Monreal-Aguinaga,* 23 I. & N. Dec. 56, 63 (BIA 2001). Martinez-Baez contends that his daughter Melanie is such a child.

1

We acknowledge at the outset that we lack jurisdiction to review a petitioner's contention that an agency should have exercised discretion in his favor. *Mireles v. Gonzales*, 433 F.3d 965, 968 (7th Cir. 2006). We have applied this jurisdictional restraint to the Board's determination of the factual question whether the petitioner has shown "exceptional and extremely unusual hardship" to the qualifying U.S. citizen. See *Jimenez-Aguilar v. Barr*, 977 F.3d 603, 605 (7th Cir. 2020). Jurisdiction is unavailable "whether the alien's argument is that the agency abused its discretion or that it failed to conduct a thorough review of the record." *Mireles*, 433 F.3d at 968.

In keeping with that rule, Martinez-Baez does not allege that the IJ should have been more thorough in his review of the record, or that he should have referred expressly to each shred of evidence in his written opinion, or that he abused his discretion. Rather, he argues that the IJ failed to recognize the existence of an entire swath of evidence that was pertinent to the hardship issue. He argues that this went beyond a simple failure to discuss certain evidence or to describe it properly. As our sister circuit has held, "the [Board] does not commit an 'error of law' every time an item of evidence is not explicitly considered or is described with imperfect accuracy, but where, as here, some facts important to the subtle determination of 'exceptional and extremely unusual hardship' have

been … seriously mischaracterized, we conclude that an error of law has occurred." *Mendez v. Holder*, 566 F.3d 316, 323 (2d Cir. 2009).

2

An applicant's asserted hardship to a qualifying relative "must be considered on its own individual facts." *In Re Andazola-Rivas*, 23 I. & N. Dec. 319, 323 (BIA 2002). The Board has held that while some comparison between other applicants' asserted hardships is necessary in order to apply the comparative hardship standard, the IJ and Board must consider individual hardships on their own terms—generalizations will not do. *Id.* at 323. This mandate places an outer limit on an IJ's ability to characterize the evidence before him. At some point, the "individual hardship" described by an IJ will diverge too much from the actual hardship shown in the record. The error in such a case is procedural: the failure to take into account the entire record, no matter what the final conclusion might be.

To support his claim of exceptional and extremely unusual hardship to Melanie, Martinez-Baez presented three pieces of evidence: (1) the Individualized Education Program created by the Lake Geneva School District for Melanie; (2) his own testimony pertaining to Melanie's hardship and how it affects her life; and (3) the testimony of Trisha Mitten, a speech pathologist at Lake Geneva Schools who works with Melanie and developed the IEP.

In holding that Martinez-Baez failed to establish hardship, the IJ relied exclusively on a perceived deficiency in the testimonies of Martinez-Baez and Mitten. We set forth the full text of the judge's rationale:

Although the respondent submitted a copy of [Melanie's] IEP plan, the testimonies of the witnesses (including the respondent) did not adequately address, and therefore did not adequately establish, the severity of her condition, the impact (both short-term and long term) of the respondent's departure (with or without her), the availability of similar treatment in Mexico if she were to accompany him, why treatment would necessarily have to be discontinued if he were to return to Mexico alone, and her future prognosis. … .

This statement makes no sense. The IJ himself just three pages earlier wrote that Mitten had "stated that Melanie's stuttering problem is mild to moderate, but that it creates problems not only with verbal communications but also socially/behaviorally because it creates the false perception that she acts aggressively." The Board picked up the "mild to moderate" characterization. The problem is worse than the fact that this is not an accurate account of Mitten's testimony: it is that this supposed evaluation of the severity of Melanie's condition appears nowhere in the record.

In her testimony, Mitten described Melanie as presenting with "accessory stuttering." "She stutters due to learning language, and also, to controlling her, her ability to define words," Mitten then explained how the condition affects Melanie's daily life:

Q: So, she has, she has—does she have trouble communicating with other people?

A [Mitten]: Yes. She—

Q: Okay. Now, how would you categorize *that trouble communicating* with other people? Now would you call it mild? Would you call it extreme? Somewhere in between?

A: It's mild to moderate.

Q: Mild to moderate.

A: Mild to moderate, depending on the day. There's—it's—because people who stutter, it highly varies. There's good days. There's bad days.

(Emphasis added). To be precise, it was the trouble communicating with others that was "mild to moderate," not the stutter. The IJ and later the Board missed this distinction. The severity of a symptom does not tell us anything about the severity of the ailment of which the symptom is only one visible manifestation.

Melanie's case illustrates this point. The IEP indicates that Melanie suffers from "Speech/Language Impairment." Wisconsin's administrative code defines that as "an impairment of speech or sound production, voice, fluency, or language that *significantly* affects educational performance or social, emotional or vocational development." Wisc. Admin. Code PI 11.36(5)(a) (emphasis added). Melanie's IEP states that her impairment causes a delay in auditory comprehension and interferes with her ability to express her thoughts and ideas.

The IEP further states that Melanie's developmental delay in language acquisition "impairs oral communication in [her] natural environment," and her language and fluency impairment "significantly affects [her] educational performance or social, emotional, or vocational development." In formal testing for language articulation and phonology, Melanie scored

"at or below 1.75" standard deviations below the mean of children her age. In formal testing to "reveal her grammar use in her native language in order to fluently formulate her thoughts," Melanie scored over two standard deviations below the mean for Spanish-speaking children of her age. Finally, the IEP concludes that "Melanie's identified speech and language needs require an individualized program[,] which supplementary aids and/or services are [unable] to provide in the regular education classroom," such that "Melanie will not participate full time with non-disabled peers" at school.

We mention these facts because they are conspicuously absent from the IJ's explanation, reproduced above. The IJ and the Board cannot simply announce that there is no evidence on a point that is in fact well covered in the record. Between the IEP and Mitten's testimony, there was ample disinterested evidence on which to base an assessment of the severity of Melanie's condition. We have no way of knowing whether, had the IJ and Board looked at this evidence, they still would have found that Martinez-Baez failed to establish the requisite hardship to a qualifying relative.

The IJ also acted as if there was no evidence about the nature of Melanie's condition, even though Mitten also covered this in her testimony. When describing what would happen if treatment were discontinued, Mitten noted that the "higher the emotion that [Melanie] has internally, the worse [the condition] gets." Further, Mitten state that Melanie has a "very fast rate of speaking," and that "her anxiety will increase" if treatment were to stop. This testimony highlights aggravating factors that exacerbate the condition.

Accordingly, this record contains significant evidence that the emotional hardships that would ordinarily be expected to

result from an alien's deportation may be exceptionally severe in Melanie's case, given that her hardship is aggravated by emotional turmoil. The IJ and the Board never grappled with this. In addition, their failure to consider the *future* hardship faced by a qualifying relative is error under the Board's own legal standard, which holds that the hardship inquiry is prospective. See *Andazola-Rivas*, 23 I. & N. Dec. at 323 ("the relative level of hardship a person *might suffer* cannot be considered entirely in a vacuum. It must necessarily be assessed, at least in part, by comparing it to the hardship others *might face*.") (emphasis added).

Nothing we have said would prevent the Board from concluding on remand that Melanie's condition does not amount to exceptional and extremely unusual hardship. But its current reasoning, based on the IJ's flawed approach to the record, cannot stand. As we noted in *Iglesias v. Mukasey*, 540 F.3d 528 (7th Cir. 2008), "a claim that the [Board] has completely ignored the evidence put forth by a petitioner is an allegation of legal error." *Id.* at 531.

3

Last, the IJ committed legal error by holding that Martinez-Baez needed to establish that similar treatment was unavailable in Mexico. That question is relevant only if the qualifying relative would be accompanying the applicant upon removal. The Board puts it this way: "to the extent that a claim [for relief] is based on the health of a qualifying relative, an applicant needs to establish that the relative has a serious medical condition and, *if he or she is accompanying the applicant to the country of removal*, that adequate medical care for the claimed condition is not reasonably available in that country." *Matter of J-J-G-*, 27 I. & N. Dec. 808, 811 (BIA 2020)

(emphasis added). If the qualifying relative will be staying in the United States, the applicant needs only to establish the seriousness of the condition.

It "is the applicant's burden to establish that a qualifying relative will accompany him or her to the country of removal." *Id*. at 811 n. 3. When Martinez-Baez was asked "if you went back to Mexico, would your kids go with you?" he replied "Possibly." When asked if his partner would go with him, he said "Possibly so." The government's attorney then followed up, "So you haven't decided one way or the other," and Martinez-Baez said "yes." On this record, it is entirely possible that Melanie will exercise her right as a U.S. citizen to stay in the country, either with her mother or some other qualified adult. We do not underestimate the emotional pain that such an outcome would entail. Nonetheless, since it is by no means clear that Melanie would end up in Mexico, Martinez-Baez did not need to delve into the quality of care she hypothetically might receive there. He needed only to show that his removal from the United States would result in exceptional and extremely unusual hardship to her. It was thus error for the IJ to demand that Martinez-Baez prove the unavailability of care in Mexico.

## IV

Accordingly, we GRANT the petition for review and REMAND for further proceedings.